# FRANKEL & NEWFIELD, P.C.

ATTORNEYS AT LAW

Justin C. Frankel*
Jason A. Newfield*

*Admitted in NY and CT

585 Stewart Avenue
Suite 301
Garden City, NY 11530
Tel: (516) 222-1600
Fax: (516) 222-0513
www.frankelnewfield.com

February 9, 2007

**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**
Lorraine Adell Harris
Disability Claim Manager
CIGNA Group Insurance
Routing P-250
P.O. Box 22325
Pittsburgh, PA 15222-0325

|  | Re: | Claimant: | Jane Barnes |
|---|---|---|---|
|  |  | Policy Holder: | Zeneca, Inc. |
|  |  | Policy#: | LK 7321 |

Dear Ms. Harris:

We are the attorneys for Jane Barnes in connection with her claim for disability benefits under a contract of insurance between CIGNA and her employer ("Zeneca, Inc."). This shall be Dr. Barnes' appeal of CIGNA's August 17, 2006 decision.

## I.    INTRODUCTION

This constitutes Jane Barnes' ("Dr. Barnes") appeal in connection with CIGNA's August 17, 2006 adverse benefit determination of her claim for long-term disability benefits, pursuant to a policy under which she became insured as an employee with Zeneca, Inc. ("Zeneca").

The evidence and arguments submitted in support of Dr. Barnes' claim demonstrate that, as a result of her co-morbid conditions, including failed discectomy/failed back syndrome, L5-S1 fusion, multilevel lumbar degenerative disc disease, posterior compartment syndrome (i.e. SI and facet joints), neuropathic pain, myofascial syndrome resulting in myofascial cervicogenic headaches, cervical disease, endometriosis, arachnoiditis, sciatica in both legs, displaced right knee cap, right

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 2

knee cartilage damage, chronic pain syndrome, reactive sleep disturbance, depression, and intermittent cognitive impairment secondary to her intractable pain and medications, she was and is still unable to perform the material and substantial duties of her occupation as a Research Scientist, or any occupation for which she is reasonably fitted based upon her age, training, education and experience, and is thus entitled to her long term disability benefits under her policy.

As set forth below and in the annexed exhibits, it is respectfully submitted that CIGNA's determination to deny benefits to Dr. Barnes was erroneous, was rendered in an arbitrary and capricious manner, was made as a result of CIGNA's inherent conflict of interest as claims payor and claims determiner, which conflict actually influenced the decision making, and must be reversed. In its review of Dr. Barnes' claim, CIGNA improperly ignored the powerful medical evidence and the severe limits upon Dr. Barnes' functional abilities in making its incorrect determination that she was not qualified for long term disability benefits. Thus, CIGNA's decision must be reversed.

Specifically, CIGNA relied upon a flawed, biased medical examination, which erroneously found Dr. Barnes capable of working in a sedentary capacity, and which then influenced an improper peer review and transferrable skills analysis that were largely based on its findings. As all of these reports were based upon multiple inaccuracies and misinformation, as well as the bias of those individuals operating under a conflict of interest performing the evaluations of Dr. Barnes' disability, CIGNA's determination was improper and incorrect. In addition, CIGNA failed to lend proper credence to Dr. Barnes' treating physicians, ignoring a wealth of medical support for her disability, including medical records, objective diagnostic reports, and her physicians' clinical observations, in favor of the biased reports of those CIGNA enlisted to provide their own opinion, only one of whom ever met or examined Dr. Barnes. The overwhelming medical support for Dr. Barnes, upon review, speaks to the severity of her disabling condition and must compel CIGNA to reverse its adverse benefit determination and reinstate her claim.

Based upon the facts set forth below, supported by the accompanying medical reports, test results, exhibits and narrative statements of Dr. Barnes and her family and friends, and her treating physician, Dr. Joel, it is respectfully submitted that CIGNA must reverse its determination and begin paying disability benefits to Dr. Barnes.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 3

## II.    STATEMENT OF FACTS

At the time of her disability claim, Jane Barnes was employed by Zeneca, Inc. See Personal Statement of Jane Barnes, annexed hereto as Exhibit "A." Dr. Barnes' disability insurance coverage was purchased through the CIGNA group disability policy held by Zeneca, Inc.

### A.    Relevant Provisions of the Disability Income Policy

While employed at Zeneca, Inc., CIGNA issued a Group Long Term Disability policy ("the Policy"). During the course of her employment with Zeneca, Inc., Dr. Barnes was insured under the Policy, which provided, *inter alia*:

> An employee is Disabled if, because of Injury or Sickness,
>
> You are unable to perform all the material duties of your regular occupation; and after you have been disabled for 24 months, you are unable to perform all the material duties of any occupation for which you are or may reasonably become qualified based on your education, training or experience.

Dr. Barnes, as a result of her conditions, including failed discectomy/failed back syndrome, L5-S1 fusion, multilevel lumbar degenerative disc disease, posterior compartment syndrome (i.e. SI and facet joints), neuropathic pain, myofascial syndrome resulting in myofascial cervicogenic headaches, cervical disease, arachnoiditis, endometriosis, sciatica in both legs, displaced right knee cap, right knee cartilage damage, chronic pain syndrome, reactive sleep disturbance, depression, and intermittent cognitive impairment secondary to her intractable pain and medications, is disabled as per the conditions of her long term disability policy and qualifies for disability benefits as of the date prior to the denial of her claim.

### B.    Dr. Barnes' Disabling Condition

### 1.    Onset of Symptoms

At the time of her disability, Dr. Barnes worked for Zeneca, Inc. as a Research Scientist. Her position required her to administer scientific studies, many times involving the metabolism of

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 4

pesticides in plants and soil systems. At that time, Dr. Barnes was responsible for all aspects of research, from obtaining the soil from an agricultural field to filling pots with soil to spraying pesticides. The application phase could require wearing a Gortex suit for a whole day and lifting pots that could weigh seventy pounds or more. She was also responsible for watering and monitoring the specimens every day, including weekends. Over the course of her employment, Dr. Barnes' responsibilities grew to include understanding, interpreting and abiding by all EPA guidelines, representing the company at EPA meetings, meeting with other company business people to report on scientific aspects of products, supervising staff working on her studies, and working in the laboratory on the studies, herself. She was often involved in presenting her scientific research to colleagues, businesses, professional meetings, and in other instances where she acted as a scientific expert.

Each study that Dr. Barnes performed required a written protocol, which included recorded details of the studies, with raw data, and eventual reporting of the study upon its conclusion, without secretarial assistance. The written aspect of her position involved both computer work and writing in a notebook. The computers generally took a very long time to process data, so Dr. Barnes would typically spend several hours working on the computers, while she completed the notebook portion of her writing at her desk. Work would last at least eight hours each day, as Dr. Barnes often worked many more hours each day in order to finish projects or meet deadlines for her assignments. Her work often continued once she returned home for the evening, reviewing work for the next day.

In addition to these duties, Dr. Barnes was also required to participate in meetings, which were generally on a range of topics. These meetings would take place in meeting rooms with inadequate chairs, which offered no lower back support or were constructed of hard plastic, which were very uncomfortable. She also had to travel for work, for any number of reasons, including scientific meetings, business meetings, project meetings, or to field research sites. Dr. Barnes often traveled by car to meetings, but sometimes would have to fly for long trips from California to the east coast, or to England. Traveling would often require Dr. Barnes to carry luggage and work materials, which were quite heavy, through airports, on buses and trains to get to her destination.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 5

Dr. Barnes was athletic, which helped her to persevere under such a demanding workload and schedule. In fact, Dr. Barnes was active in a number of activities, including swimming at her local pool, where she was a member of the Master's Swim Team. Dr. Barnes would swim at 5:30 a.m. each morning, get dressed at the pool and then commute for 45-60 minutes each way to and from work. She generally either worked through lunch or went for a run, and often traveled throughout the campus by bicycle.

However, the hours of continuous work in strenuous positions began to take its toll on Dr. Barnes. Her back was constantly strained and the physical stress from working at her desk and at her computers caused began to cause Dr. Barnes a great deal of pain. Dr. Barnes' initial back injury occurred in November, 1991, while she was at work for Zeneca, Inc. Dr. Barnes had just completed the sixth research report in a row she had completed over the past seven months, which caused great stress on her back. She experienced pain at that time but worked through it. The following day, Dr. Barnes recalls feeling as though her upper back "froze;" she could not bend her neck, and the pain between her shoulder blades was unbearable.

The following Monday, Dr. Barnes sought treatment with a doctor, who prescribed physical therapy, a back class, and indicated that her upper back pain was related to her lower back, without giving any real explanation for her symptoms. Dr. Barnes was extremely dedicated to her work, especially studies that required her consistent attention, and so she worked in spite of her growing pain. There were a number of pending deadlines that Dr. Barnes was expected to meet, and she felt compelled to continue her studies to the best of her ability. This was difficult, as most of her work required sitting at a desk or computer, and doing so aggravated her pain. She also found herself unable to look down at her desk, due to the pain. Dr. Barnes implemented certain modifications to her workstation, including a slant board, that elevated her work so that she didn't have to look down. She also ordered a new chair, to see if that would help alleviate her pain.

Dr. Barnes struggled a great deal to work over the next six months as she worked to complete her studies. Her determination to work in spite of her pain caused her to suffer immensely, as the pain worsened with each day that she spent working at her desk, even with her slant board and new chair. Upon completion of her study, Dr. Barnes requested an ergonomic evaluation of her work

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 6

space and increased her insurance options in order to address her worsening back pain. To her dismay, Dr. Barnes' schedule became more demanding and less flexible, as she was assigned additional studies and pressured to complete the work on time, despite her condition. At this point, Dr. Barnes was required to travel to Washington, D.C. and to England for business. She was given special permission to fly business class to England, as the long flight was very difficult for her to endure, given the pain in her back. During that time, Dr. Barnes was experiencing severe sciatica in her left leg, and she spent much of her time in England simply trying her best to make it through the trip.

By the time she returned home from England, it became clear to Dr. Barnes that she could not go on struggling to work in her demanding position, as it was causing her pain to get worse. She accepted a transfer to a less-strenuous, lower-level position. Dr. Barnes hoped that in this less demanding position, she would be able to continue working while attempting to manage her pain. As she began working in her new position, Dr. Barnes found herself somewhat lost; she could not do lab work, or much of anything, because her back pain was so severe. She could not walk without pain, and attempting to lift or move anything was excruciating. She described her pain as typically a "six out of ten" in the morning, rising to a "ten" within the first hour of work. Her pain was unbearable. She was also experiencing radiating pain in her leg, which did not subside over time, but rather persisted for months. Shortly thereafter, her doctor determined that Dr. Barnes had an extruded disc, which required immediate surgery.

Dr. Barnes stopped working on December 6, 1994 as her condition grew more painful and she began preparation for her discectomy procedure. Dr. Barnes was hopeful that the discectomy would address the cause of her back pain entirely, allowing her to return to the level of functionality she had previously enjoyed. On December 15, 1994, Dr. Barnes' surgeon removed a large fragment from the L5/S1 disc space, which her doctor remarked was much larger than he had expected.

Only two months later, in February, 1995, Dr. Barnes underwent another major surgical procedure, this time to address her severe endometriosis. Although she had suffered the effects of endometriosis since 1993, Dr. Barnes developed severe abdominal pain in January, 1994 which compelled her doctor to address it with surgery. (Dr. Barnes opted to have both of these surgeries

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 7

performed within close proximity of each other, so as to minimize the amount of time she would have to miss work.)

However, the outcome of these surgeries was not as Dr. Barnes had hoped. The surgery performed to address Dr. Barnes' endometriosis was extensive and only partly productive, as her doctors only removed a portion of the masses; she still suffered from pain after the surgery. In addition, her severe and unrelenting back pain had not resolved. In fact, Dr. Barnes found that instead of the "quick fix" she had hoped for, she experienced greater pain following the surgery than she had before. The pain was excruciating, and she lost a great deal of strength in her left leg, which she never regained. Dr. Barnes discovered, years later, that her surgeon had accidently punctured her dural sac during the discectomy, which likely resulted in arachnoiditis, accounting for her continued, worsening pain. Dr. Barnes became discouraged by the lack of improvement in her symptoms after undergoing such invasive and extensive procedures.

Dr. Barnes returned to work in May, 1995, and immediately found work to be very difficult. Dr. Barnes felt weak, and was in a great deal of pain. Her office set-up, and the various tasks she would have to perform each day, continued to make her pain worse. She found it extremely difficult to sit at a desk, bend to get files, or lift the notebooks that she used, which were heavy. Her knee pain, which had developed more noticeably while she was recovering from her surgeries, became worse, as well. She was unable to perform virtually all aspects of lab work, and even found opening doors, equipped with airflow resistance, to be a burden. Almost immediately, Dr. Barnes had to drop cut her work schedule down to part-time status, as her pain and fatigue became overwhelming and she could not sustain a full day of work. She continued to work as much as she could, with help from the company nurse, who helped Dr. Barnes to set up her office in the most comfortable manner possible. Even her commute became an issue, as her commute alone caused her severe pain, which only got worse as the day went on,

As time went on, her condition continued to get worse, as her pain became unbearable and Dr. Barnes sought out further medical treatment. In 1996, Dr. Barnes was sent to an independent doctor, Dr. Isono, who ordered a discogram in June of that year, and was alarmed by the results; the discogram revealed three very bad discs, and the MRI demonstrated multiple herniations in several

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 8

discs, as well. He recommended a three-level fusion, which was drastic, but her other doctors disagreed, given the highly invasive and extensive nature of this major surgical procedure. Dr. Isono remarked that he could not believe Dr. Barnes was still working, judging by the severity of her condition, as evident by the discogram and MRI results.

Dr. Barnes' ability to produce the same quality of work, however, had changed drastically as her condition had progressively worsened. By 1997, her work had decreased considerably, as she could no longer visit her research trials to monitor them, nor could she perform analysis, because her back hurt too much. She began tele-commuting part-time, which helped to avoid the severe upper back spasms she experienced from driving, but the added time she spent in her office at home caused her pain from the extended periods of sitting and working at her desk. Dr. Barnes also began to experience swelling of her hands and legs when she would work at the computer. She struggled and suffered a great deal in the final months at her job, her goal to finish her studies and stop working completely.

Dr. Barnes began pain management treatment in spring of 1997. She was prescribed new medications, including powerful narcotics, in an effort to treat her pain. This further impacted upon Dr. Barnes' abilities, as she constantly found it difficult to stay awake as a result of these medications. Dr. Barnes began to lose hope by fall of 1997, and enlisted the help of a surgeon, Dr. Slucky, who agreed to perform a fusion surgery on her spine. Dr. Barnes found herself under enormous pressure at work to get a number of things done before she was to start her disability leave. During her last several weeks of work, Dr. Barnes was barely able to function at work at all; she gave her best effort in completing the assignments given to her and, as she recalls, work consumed every bit of her energy up until the point where she stopped working. By that point, Dr. Barnes was completely drained, without any energy left for her responsibilities at home. She was overwhelmed by the fatigue and unrelenting pain that prevented her from doing much of anything.

Dr. Slucky performed a one-level fusion surgery in January, 1998. Dr. Slucky indicated that her lowest-level lumbar disc, at L5/S1, was badly degenerated with significant collapse of the disc space, and chose not to fuse the next two levels up, as he was concerned about performing such an extensive surgery as a three-level fusion. He explained that while the two disc levels up from L5/S1

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 9

were degenerated, the bottom level was in most dire need of attention. He and Dr. Barnes were optimistic that addressing this level would help alleviate her pain.

Unfortunately, Dr. Barnes continued to suffer a great deal of pain after the surgery. In fact, she never improved in her functionality, or in her pain levels, which are now controlled by a number of powerful narcotic medications. Dr. Barnes remained in physical therapy for several years following her fusion surgery, and she has failed to have any relief in her painful symptoms. She has been unable to work since December 12, 1997, her last day of work at Zeneca, Inc.

Dr. Barnes' condition has continued to worsen over time. Since 1999, she has been treating with Dr. Mannie Joel, a pain management specialist who has not only carefully monitored and treated her back condition, but has also addressed the issues secondary to her chronic pain. He prescribed psychotherapy so that Dr. Barnes can properly deal with the emotional ramifications of losing her functionality, her livelihood, and the athletic lifestyle she enjoyed prior to the onset of her disability. He performed a second discogram several years after her fusion surgery; this time, it revealed not only three bad discs, but **all** of Dr. Barnes' lumbar discs showed varying levels of degenerative disease. Dr. Joel recommended proceeding with an IDETT procedure (Intra-Discal Electro-Thermal Therapy), which Dr. Barnes agreed to and Dr. Joel performed two IDETT surgeries. Dr. Barnes had to wear an abdominal brace for months following the surgery, and still, Dr. Barnes did not experience any relief from her back pain.

Dr. Joel remains Dr. Barnes' treating doctor for her back condition. Currently, Dr. Joel is exploring different treatment options, including surgical implantation of a spinal cord stimulator, which may provide Dr. Barnes with some hope of pain relief. He continues to treat Dr. Barnes with medications and monitors her condition for changes.

Dr. Barnes has suffered from a number of other co-morbid medical conditions over the course of her disability, which further impact upon her functional abilities. Dr. Barnes suffered cartilage damage in her right knee, which causes further pain in her knees and back, as well as a displaced right knee cap around the time of her surgeries (in 1994-1995). She has endured pain in her left foot, as well as painful big toes from ingrown toenails and other ailments. She suffers from arachnoiditis, likely caused by the complication during Dr. Barnes' initial discectomy procedure in

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 10

1994. As mentioned previously, Dr. Barnes continues to suffer from endometriosis, as not all of the remnants of this condition were removed during her surgery in 1995. Dr. Barnes has been diagnosed with a number of conditions characterized by severe, chronic pain, including myofascial syndrome, neuropathic pain, chronic pain syndrome, posterior compartment syndrome, and sciatica, characterized by severe sciatic pain that radiates through both legs. Her headaches, which occur often, are quite bothersome to Dr. Barnes and render her unable to concentrate or process information accurately. Finally, Dr. Barnes suffers from reactive sleep disturbance, which prevents her from getting restful sleep and contributes to the intermittent cognitive deficiencies she suffers as a result of her intractable pain and from the side effects of her medications.

Dr. Barnes continues to suffer from severe, unrelenting pain, and none of the numerous treatment methods she and her doctors have attempted, to date, have yielded any appreciable reduction in her pain. Dr. Barnes' prognosis for improvement is poor, and her doctors have tailored her treatment plan to enhance her quality of life, given her permanent limitations in her functional ability.

2. **Medical Treatment of Dr. Barnes**

A. **Dr. Joel's Treatment of Dr. Barnes**

Mannie Joel, M.D., has been Dr. Barnes' treating physician since July, 1999. Dr. Joel's treatment of Dr. Barnes reveals a medical history which he describes as "complex" for which he has continued to treat her with minimal improvement in her painful symptoms. Dr. Joel has consistently communicated his opinion of Dr. Barnes' condition with CIGNA and continues to opine that Dr. Barnes is totally disabled as a result of her condition and finds her incapable of sustaining any meaningful work whatsoever. Dr. Joel has expressed concern over CIGNA's handling of Dr. Barnes' claim, particularly in the evaluation of her medical records and the examination performed by Dr. Pickett on CIGNA's behalf. Dr. Joel's opinion, well-supported by a long history of treatment of Dr. Barnes, a wealth of both subjective and objective evidence, and his clinical observation, is that Dr. Barnes is permanently disabled. See Dr. Joel's Medical Records, annexed hereto as Exhibit "B." See also Exhibits "C," "D," and "G," respectively.

Dr. Joel indicated that Dr. Barnes suffers from a number of disabling conditions, including

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 11

but not limited to failed diskectomy/failed back syndrome, L5-S1 fusion, multilevel lumbar disc disease, posterior compartment syndrome (i.e. SI and facet joints), neuropathic pain, myofascial syndrome resulting in myofascial cervicogenic headaches, cervical disease, reactive sleep disturbance, depression, and intermittent cognitive impairment secondary to her intractable pain and medications. Despite numerous attempts to treat Dr. Barnes' conditions in the hopes of offering her pain relief and increased functionality, Dr. Joel has indicated that no treatment methods have been successful and that Dr. Barnes is totally disabled.

## Dr. Joel's "Final Report of Disability", January 6, 2002

On January 6, 2002, Dr. Joel authored a final report of permanent disability, chronicling in detai his treatment of Dr. Barnes, which he submitted to CIGNA in connection with Dr. Barnes' disability claim.  See Dr. Joel's Final Report of Permanent Disability, dated January 6, 2002, annexed hereto as Exhibit "C." In this report, Dr. Joel indicated that he had been Dr. Barnes' treating physician beginning on July 14, 1999, at which time he evaluated her for continued back pain and related symptoms stemming from an industrial injury suffered in November, 1991 resulting in lumbar spine injuries. At that time, she was diagnosed with multiple level lumbar disc disease based upon MRI findings. In December, 1994 Dr. Barnes underwent back surgery, consisting of L5-S1 discectomy, which did not alleviate Dr. Barnes' severe back pain.

Dr. Joel made reference to Dr. Barnes' treatment with her psychologist, Jean Simon, in 1995. Ms. Simon had indicated that Dr. Barnes felt compelled to meet the responsibilities of her work environment in spite of her pain and exhaustion, and that although she had made numerous attempts to adapt her activities to her physical limitations, it was clear that Dr. Barnes could not go on working much longer. In December, 1995, Dr. Barnes began telecommuting 50% of the time as advised by her doctor.

An MRI performed in 1996 revealed bulging discs at L4-5 and L5-S1; a lumbar discogram performed that year, as well, demonstrated abnormal symptomatic discs with concordant pain at L3-4, L4-5, and L5-S1. Dr. Barnes was evaluated by Dr. Isono in July, 1996, who recommended anterior posterior fusion from L3-S1. After much discussion among Dr. Barnes' treating doctors,

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 12

a one-level fusion procedure was performed in early 1998, after she had failed all conservative treatment methods that had been attempted thus far. (By this time, Dr. Barnes' ability to work had diminished severely; her doctors indicated that she was sincere in her efforts to continue working, despite her unrelenting pain, but as time went on her doctors instructed her to reduce the amount of time she spent working, until finally in 1997 her symptoms were deemed "incapacitating and unacceptable," rendering her unable to work, and her second open back surgery was performed.)

Following the anterior interbody fusion that was performed in 1998, Dr. Barnes experienced a (temporary) slight decrease in her low back pain, but also developed bilateral foot pain and began taking additional medications. She continued treating with Dr. Rosenberg, a pain management specialist, who provided Dr. Barnes with opioids and nerve blocks. She did not respond well to morphine and methadone and was subsequently referred to Dr. Joel's office for further evaluation and treatment.

Dr. Joel's January 6, 2002 report of disability indicated that Dr. Barnes' main complaint remains her severe, unrelenting pain, which is extensive; her pain is concentrated in her back, radiating down both legs all the way to the foot. She also has pain at the Achilles tendon and at the heel pads, and she cannot put pressure on her heels (altering the way she walks); pain in her left foot, which radiates to the toes; neck pain, which Dr. Joel explained probably reflected her cervical disc injuries; intrascapular pain; pain at the medial border of the left scapular, radiating anterior to an area just below the left breast; pain all along the spine into the lumbar spine; pain in her neck radiating down to her shoulders and upper arms, and up to her occipital area where it causes occipital headaches; and pain radiating to her temporalis areas with temporalis muscle spasm and jaw pain. Dr. Barnes' pain is constant and varies from moderate to severe. Her pain is associated with physical activity and sitting, standing, walking, driving, shopping, bending and stooping exacerbate her pain. Her pain is also increased by lifting and carrying, which she can tolerate for only 5-10 minutes. Household chores, and other less strenuous tasks such as reaching, preparing food, managing pets, getting in and out of the car, and doing desk work cause her increased pain as well (she can only tolerate desk work for a maximum of 10-15 minutes). Eating, cold, physical activity, pressure, touch, stress, fatigue, sneezing, and coughing all worsen her pain, which she describes as constant,

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 13

radiating, annoying, stabbing, aching, burning, cramping, nauseating, shooting, unbearable, piercing, tight and sharp. Dr. Joel noted that these pain levels are applicable when Dr. Barnes takes her medications; if she forgets to take her pain medications, her pain escalates to an "incapacitating" level. In addition to her unrelenting pain, Dr. Barnes continues to suffer from a severe sleep disturbance, which causes her to wake up 2-4 times each night, preventing her from getting a full night's sleep. She also experiences weakness in her left leg and numbness in her left calf. She experiences fatigue easily, has memory problems, and suffers from bladder frequency and bowel irritability (Irritable Bowel Syndrome).

Dr. Joel's report went on to discuss a physical examination he performed of Dr. Barnes, during which Dr. Barnes continuously changed her position. Dr. Barnes did not demonstrate any abnormal pain behavior and tested negative for Waddell's signs of pain magnification. He observed that the nerve roots of the brachial and cervical plexus bilaterally were abnormally tender, and she had pain at bilateral occipital and suprascapular nerves with multiple myofascial findings in the paraspinous muscles, trapezius muscles, and temporalis muscles. Dr. Barnes' flexion and extension of the lumbar spine was decreased by 50%, with extension causing more pain than flexion. Significant tenderness was observed at the facet joints bilaterally, and the sciatic notches were very tender, more so on the left than the right. She had tender SI joints and paraspinous muscle spasm with multiple trigger points, as well as some atrophy of the left thigh (the circumference was 19 inches on the left, 20 inches on the right). Dr. Joel observed weakness in dorsiflexion in the left ankle, as well as weakness in flexion and extension in the left knee. There was also decreased sensation over the dematomes at L4-S1 on the left side.

Dr. Joel included a list of his diagnostic impressions, including: multilevel lumbar disc injury status post L5-S1 micro-laminotomy and discectomy; status post anterior interbody fusion at L5-S1 with bone graft from the right anterior iliac crest; status post multilevel IDETT; failed back surgery syndrome with intractable pain; posterior compartment syndrome; neuropathic pain; myofascial syndrome extensive; possible cervical disc disease; reactive sleep disturbance; depression; and cognitive impairment secondary to intractable pain and possibly medications.

Dr. Joel indicated that, in his opinion, Dr. Barnes has become "permanent and stationary"

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 14

as of November 27, 2001. He noted that reasonable treatment for Dr. Barnes has been exhausted, and that he did not expect her to improve much further with current treatments; rather, she will likely deteriorate over time and suffer periods of flare-ups of her condition. He explained that Dr. Barnes has severe permanent disabilities that render her unable to return to her previous work, and that he did not believe she would be capable of completing any meaningful vocational rehabilitation.

In listing various factors of Dr. Barnes' permanent disability, Dr. Joel listed pain as the most significant factor, present in the low back, both hips, both lower extremities, thoracic spine, cervical spine, both shoulders, both upper arms, and cervicogenic headaches. Dr. Joel noted that this severe and constant pain is directly related to her diagnosis and is stationary, having a significant impact on Dr. Barnes' functions of daily living.

Dr. Joel also also cited objective support for this finding of disability, including those clinical observations (as described above), including neurological findings in the left lower extremity, the lumbar spine findings, and findings in the cervical spine, as well as widespread myofascial changes. In addition, Dr. Joel listed multiple abnormal investigations, including MRI's, discograms, and multiple epidurograms, as well as observable cognitive impairment, as objective support.

Dr. Joel reiterated his opinion that Dr. Barnes is 100% disabled, and that she could not tolerate any form of meaningful employment. He noted that her restrictions and limitations would include no prolonged sitting, walking, or standing, frequent changes of positions, no climbing, no kneeling, no squatting, no bending, no stooping, no repetitive lifting, no repetitive pushing or pulling, no above shoulder work, no repetitive use of the arms, no forceful grasping or repetitive grasping, and no operation of a motor vehicle or any other dangerous machines. Dr. Barnes would have to miss days of work and there would be periods of time during which she would not be able to concentrate and memorize things. She would require frequent breaks during which she would have to lay down (after no more than 20 minutes of sitting) **for a maximum of two hours each day** of work, combined, from home, in a very ergonomic situation. Based upon these restrictions and limitations, Dr. Joel deemed Dr. Barnes totally and permanently disabled.

In terms of her future care, Dr. Joel noted that such care would be "extensive" and that Dr. Barnes was expected to suffer ongoing pain that would require more intensive treatments. Dr. Joel

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 15

discussed possible future treatment modalities, aimed at relieving rather than curing the effects of the injury; these include pain relieving procedures, medications, hydrotherapy, physical therapy, and psychological counseling. Dr. Joel indicated that Dr. Barnes might become a candidate for trials of neuromodulation if she deteriorates in the future, such as spinal cord stimulation or an implanted morphine pump. He noted that these options should be left open on a precautionary basis[1]. Dr. Joel also cautioned that as her condition continues to deteriorate, Dr. Barnes may require the assistance of a home health aide, and perhaps at some point more intensive extended-type care.

Dr. Joel's report was accompanied and supported by a numerous medical records, including records of visits, records of her previous medical treatment with other medical care providers, and an extensive medical history, as well as objective support as described in Dr. Joel's report. See Dr. Joel's Treatment Records, annexed hereto as Exhibit "B." See also Dr. Joel's Permanent Disability Report of January 6, 2002, annexed hereto as Exhibit "C."

### Dr. Joel's Letter to CIGNA, May 19, 2006

On May 19, 2006, Dr. Joel provided a narrative statement to CIGNA in response to the report of the review purportedly performed by Dr. Justice Pickett in connection with Dr. Barnes' disability claim. See Dr. Joel letter to CIGNA (included in Dr. Joel's Medical Records, Exhibit "B"). Dr. Joel expressed his perplexity in response to CIGNA's conclusion that Dr. Barnes is not disabled, as he declared her permanently disabled in his report of November 27, 2001. He also conveyed his concern that he was not informed of CIGNA's evaluation by Dr. Pickett, despite having served as her primary treating physician for quite some time, as well as his concern about the ethical implications of CIGNA's conducting the medical review of Dr. Barnes in light of its inherent conflict of interest that he feared influenced its decision.

In his statement, Dr. Joel noted that since 2001, no treatment had yielded any improvement in Dr. Barnes' condition; rather, all treatment has been aimed at merely maintaining the very low

---

[1]    Dr. Joel is now discussing implementing these treatment option with Dr. Barnes; this demonstrates the severity of her condition and the deterioration of her health over the past five years.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 16

level of functioning Dr. Barnes is capable of. He also emphasized the effects of the medications Dr. Barnes is dependent on, including high levels of opioid analgesia, including Hydrocodone and OxyContin, and other medications prescribed, as well.

Dr. Joel indicated in his letter that he had carefully reviewed Dr. Pickett's report and found numerous inaccuracies, taking issue with the incorrect and incomplete nature of the report. He indicated that despite two open back surgeries, as well as other spinal procedures, multiple medications, physical therapy and supportive counseling, these treatment efforts yielded no change in her status, and she became "permanent and stationary." He wrote that her disability is primarily due to her unrelieved pain and her medications, rather than a simple orthopedic issue but also neurological in nature.

Dr. Joel also referenced a recent examination of Dr. Barnes, during which he observed atrophy in the leg, as well as decreased range of motion of the lumbar spine and symmetrical deep tendon reflexes. He tested Dr. Barnes' motor strength, which revealed weakness in the hip extension on the left side by 30%, as well as weakness in the left ankle in the plantar and dorsiflexion regions. He also indicated that Dr. Barnes' facet joints and SI joints are constantly 2-3+ tender, and that her sciatic notches are also very tender bilaterally.

Dr. Joel indicated that CIGNA's diagnosis of Dr. Barnes is inadequate, focusing merely on an orthopedic condition, where Dr. Barnes has been diagnosed with failed discectomy/failed back syndrome, L5-S1 fusion, multilevel lumbar degenerative disc disease, posterior compartment syndrome (i.e. SI and facet joints), neuropathic pain, myofascial syndrome, resulting in myofascial cervicogenic headaches, cervical disease, arachnoiditis, sciatica in both legs, displaced right knee cap, right knee cartilage damage, chronic pain syndrome, reactive sleep disturbance, depression, and intermittent cognitive impairment secondary to her intractable pain and medications; which well exceed the scope of orthopedic medicine.

As Dr. Joel concluded his letter to CIGNA, he disputed the findings of Dr. Pickett, explaining that Dr. Pickett was incorrect in opining that Dr. Barnes was capable of sitting continuously and that his assessment of Dr. Barnes' phyical capacities was wrong, and based solely on Dr. Pickett's own opinion. Dr. Joel argued that Dr. Pickett's claim that she can sit continuously is inconsistent with

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 17

his own extensive treatment with Dr. Barnes and his clinical observations, where he states that Dr. Barnes can only tolerate a maximum of ten minutes of sitting, followed by a change in position; in addition, she can only tolerate fifteen minutes of sitting a few times each day. Dr. Joel also indicated that Dr. Barnes can tolerate standing and walking for only 20-30 minutes at a time; he found it highly questionable that Dr. Pickett and CIGNA could find Dr. Barnes capable of sustaining a sedentary job for eight hours each day given these specific limitations.

Dr. Joel also emphasized the effects of Dr. Barnes' cognitive impairment, which Dr. Joel indicated would preclude her from working in any job where cognition is important, which he said "includes 100% of positions I can think of." He noted that due to her cognitive impairment, he had instructed Dr. Barnes not to drive a car, although he is aware that she occasionally does have to drive. Dr. Joel noted that Dr. Barnes has been very compliant with her medications and that she has never overused them or done anything against his medical advice.

In closing his letter, Dr. Joel reiterated his findings, including that Dr. Barnes is 100% disabled, and that he cannot think of any meaningful employment that she would be able to tolerate. Dr. Joel wrote that her pain is intractable and that the combination of her pain and cognitive impairment render her unable to work. In terms of Dr. Barnes' ability to work, Dr. Joel opined that the only conceivable work she might be able to do would be for short periods of time at home and with a very ergonomic situation, for a maximum of two hours added together over the course of "a good day." (This is consistent with his finding Dr. Barnes totally disabled, as the ability to perform a maximum of two hours combined over the course of a 24-hour period, a speculation Dr. Joel presents as a best-case scenario on a "good day," **does not** constitute meaningful work.) In addition, Dr. Joel indicated that on other days, she will not be able to work at all, and that she would have a hard time memorizing things or concentrating. Dr. Joel emphasized his opinion that Dr. Barnes is 100% disabled and that she is not capable of sustaining any type of meaningful employment as a result of her disabling intractable pain and cognitive impairment. See Dr. Joel's letter to CIGNA, included within Dr. Joel's Medical Records as Exhibit "B." (Dr. Joel's letter to CIGNA is also discussed later in this appeal, under subsection "E " and annexed separately as Exhibit "G.")

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 18

## Dr. Joel's Narrative Report of November 20, 2006

More recently, Dr. Joel prepared a narrative report on November 20, 2006, regarding Dr. Barnes' continued disability. See Narrative of November 20, 2006, annexed hereto as Exhibit "D." In this narrative report, Dr. Joel referred to his final report of disability, written on January 6, 2002, and wrote that his opinion as conveyed in that report (that Dr. Barnes is permanently disabled) remained true; that the diagnostic impression was still the same, the factors of permanent disability were the same or worse, and that the work restrictions and history were the same, as well.

Dr. Joel explained that since authoring that report, he has continued to treat Dr. Barnes with modalities, medications, pain relieving procedures, an exercise program, and supportive counseling when able. He recalled at least two radiofrequency median branch neurolysis procedures to the lumbar facet joints, as well as a diagnostic facet injection, that Dr. Barnes had undergone. She also had two IV lidocaine treatments and other modalities, like external stimulation. Dr. Joel indicated that Dr. Barnes also requires fairly large doses of medications, including but not limited to OxyContin, Hydrocodone, Effexor, Zyrtec, Ambien CR, Provigil, and Hytrin.

Dr. Joel referenced a recent visit of October 30, 2006, during which Dr. Barnes came for treatment after suffering a significant flare-up of back pain while trying to tie her shoe. At that time, Dr. Joel explained, he discussed with Dr. Barnes other options for treatment, including spinal cord stimulation, which would involve implanting electrodes in her spine connected to a pulse generator which would be implanted elsewhere (if an initial trial were successful). Dr. Joel clarified that this procedure would not have any bearing on her disability status, as the level of functionality improvement he would hope to achieve would merely provide a better means of pain management, which she currently does not have. Dr. Joel continues to find Dr. Barnes totally disabled. See Narrative Report of November 20, 2006, annexed hereto as Exhibit "D."

Dr. Joel, through the numerous statements he has provided to CIGNA in support of Dr. Barnes' disability claim, as well as his extensive medical records documenting his treatment of Dr. Barnes, has offered overwhelming support for her claim and remains firm in his position that Dr. Barnes is totally disabled. CIGNA is compelled to consider and appreciate the materials provided by Dr. Joel, and his opinion as to Dr. Barnes' medical condition and her functional abilities, as he

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 19

has a long-standing patient-doctor relationship with Dr. Barnes and can attest to the deterioration of her health and the progression of her condition. Dr. Joel's treatment records support his opinion that Dr. Barnes is totally incapable of working in any meaningful capacity as a direct result of her medical condition. See Dr. Joel's Medical Records, annexed hereto as Exhibit "B."

**B.    CIGNA Failed to Consider Other Medical Support for Dr. Barnes' Disability Claim**

Dr. Barnes, over the course of her claim, has provided CIGNA with a wealth of supportive material for her claim, including medical records, letters from her doctors, reports requested by CIGNA, and objective diagnostic scans and other objective material which has not been given proper consideration by CIGNA throughout the investigation of Dr. Barnes' claim.

These materials include, but are not limited to:

• Orthopedic Surgical Evaluation by Dr. Steven Isono, December 20, 1995;

• Evaluation by Dr. Steven Isono on July 22, 1996;

• Report upon Evaluation by Dr. Andrew Slucky on September 4, 1997;

• Operative Report (with blood analysis records) from December 17, 1998;

• Surgical Report (anterior interbody fusion of L5-S1), January 7, 1998;

• S1 Selective Nerve Root Procedure Report, July 27, 1998;

• Physical Capacities Form, completed by Dr. Joel, June 6, 2000;

• Epidural Steroid Block Procedure Report from July 7, 2000;

• Report from Dr. Jacob Rosenberg, dated March 7, 2001;

• Physical Ability Assessment by Dr. Joel, June 20, 2002;

• MRI Report from March 5, 1996;

• Lumbar Discogram, performed on June 20, 1996;

• CT- scan of the lumbosacral spine, performed September 16, 1999;

• Surgical Report (Lumbar Discectomy) performed December 15, 1994;

• Surgical Procedure Report by Dr. Joel, March 3, 2000;

• Surgical Procedure Report (Anterior Interbody Fusion at L5-S1), performed on

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 20

January 7, 1998; and

- Various other reports by Dr. Barnes' treating physicians and various objective diagnostic reports that support the severity of Dr. Barnes' disabling condition.

<u>See</u> Medical Records, annexed hereto as Exhibit "E."

In particular, the objective tests performed over the course of Dr. Barnes' disability (including the lumbar discogram performed in June, 1996; the MRI report from March, 1996; and CT-scan performed in 1999; as well as various other objective tests that demonstrate the severity of Dr. Barnes' condition), and the significant surgical procedures that Dr. Barnes has undergone (which speak to the severity of her disabling conditions) must be given special consideration in connection with Dr. Barnes' claim, as it is difficult to dispute the significance of her treatment thus far, her powerful medications, and her the objective tests that demonstrate her disability. CIGNA must lend proper credence to the reports submitted over the course of her disability by Dr. Barnes' physicians, who have consistently opined that Dr. Barnes is incapable of working in any occupation at this point in time.

It is incumbent upon CIGNA to consider all of these medical records, and all of the records that have been previously submitted to CIGNA, as well, in forming its determination as to Dr. Barnes' claim for disability. (Refer to Internal Claim File, in CIGNA's possession.)

<u>C.</u>    <u>Dr. Barnes' Condition Renders Her Unable to Work</u>

As a direct result of her co-morbid disabling conditions, Dr. Barnes is unable to perform the essential duties of any meaningful occupation for which she is reasonably suited. As discussed throughout, Dr. Barnes suffers immensely from the intense and unrelenting pain that she experiences as a result of her back conditions. Despite numerous treatment methods attempted over the years, in an effort to regain her functionality, Dr. Barnes has achieved virtually no relief of her painful symptoms.

Dr. Barnes described the pain that she endures on a regular basis, which renders her unable to work, in her personal statement, wherein she states:

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 21

I have had several episodes that have knocked my pain off the charts. I call them episodes because they take place, take over, and occupy my entire existence when they happen. These stand out because they last for a month at times. Each episode has different phases of pain, all beyond control with my current pain med regime. Since most surgery is out of the question these days, my body just has to absorb the pain. One time, we increased my OxyContin by 50% to compensate for my pain. Recently, I had a horrible episode and told the doctor that I could not imagine anything that could touch the pain I was in. There was a shooting pain through my entire spinal column that would happen out of the blue and make me scream uncontrollably. There was nothing simple about the pain, so central in my spine. And then standing up was impossible. I just could not get to the up position. I started a faster, stronger break-through medicine to help with my pain. My last episode started when I was tying my shoe. An earlier one came on after drying off my leg. I am unsure what will happen if my medicine ever stops working...

Over the years since my fusion, I have had several episodes where my pain has gone out of control and off the charts. About two years ago, my back was getting worse and I was having sciatica on the right side in addition to the left. My pain had been increasing for over six months when I put my right leg on the sink to dry it off and something moved in my low back. I heard a popping sound and my pain increased ten-fold. Not long after I used the toilet and could not get up off of it because of pain, Dr. Joel increased my OxyContin by 40 mg each dose to help with this pain.

More recently, I tied my shoe and something moved in my low back. Again I heard a noise inside and could barely walk. I preserved but could feel something was worse in my back. A few days later I reached for a paper towel only to develop even worse pain. My back was so sore that I felt the need to suck my stomach in as tight as possible to hold back the inside pain. It was impossible to stand up straight and walking was very painful. Over and over, I would get a jolt of pain shooting through my spine regardless of movement. After a week the pain was better but still increased from before the shoe-tying episode. My doctor prescribed a different breakthrough medicine, Fentora (fentanyl), for those times in a day when my pain flares real bad. We also discussed use of the stimulator that is implanted into a persons' body, which Dr. Joel is seriously considering at this point. These pain flares are sometimes triggered by a simple, every-day movement and occur sporadically, without warning.

See Personal Statement of Dr. Barnes, annexed hereto as Exhibit "A."

Dr. Barnes went on to describe her pain more specifically, indicating that, on a regular basis,

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 22

she experiences:

> Burning leg and butt, along nerves;
> Headaches;
> Severe painful stomach cramps sometimes associated with diarrhea and/or constipation;
> Nausea, with and without vomiting;
> Weak left leg from nerve pressure;
> Painful right knee pain with grinding;
> Teeth clenching/jaw popping and pain;
> Fatigue;
> Limited ability to concentrate;
> Difficulty taking care of complex tasks;
> Dry mouth;
> Painful big toes;
> Horrible tailbone pain;
> Inability to tolerate temperature extremes;
> Extreme sweating;
> Itching; and
> Anxiety.

See Dr. Barnes' Personal Statement, annexed hereto as Exhibit "A."

Dr. Barnes' pain is severe and unrelenting; it affects every aspect of her life and prevents her from doing many, if not all, of the activities she once enjoyed. Dr. Barnes truly loved her work, and loved the active lifestyle she maintained. She enjoyed swimming every morning as a member of an adult swim team, and managing her home by performing most of the household chores and doing work in the backyard. She spent a great deal of time in school and in her career participated in many research studies which she spent countless hours monitoring and documenting, as well. These days, her pain and fatigue restricts her to a recliner chair for much of the day, as it seems to be the only place where Dr. Barnes can find comfort. She can no longer swim, perform household chores or attend to the back yard maintenance; she cannot sit for any extended period of time, nor can she sustain standing or walking for any meaningful time. Her pain is consuming and debilitating and prevents her from performing even the simplest activities of daily life without a struggle.

Dr. Barnes is most certainly **NOT** capable of working in a full-time, sedentary position, as CIGNA alleges. Certainly, Dr. Barnes would prefer to work, rather than accept her limited



FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 23

functionality. Dr. Barnes, in the past, was athletic and very active in a number of activities, which she did not give up lightly. In fact, her well-documented attempts to remain working for such a substantial period of time (aided by the good condition of her body, due to her athletic training as a young woman prior to her disability) despite her condition serves to support that Dr. Barnes is a person who has always tried very hard to work, giving the absolute best effort she could even under highly stressful circumstances. It is simply not in her character to give less than 100% effort; she has proven that with her dedication to her work, especially when she was already suffering the painful effects of her condition, and her commitment to getting better by utilizing the multitude of treatment options that she has attempted. Dr. Barnes has said time and again that she would much rather work, even in a different field, if that were possible, than resign herself to a lifetime of seeking comfort in a recliner chair for as much of her day as she can.

Dr. Barnes cannot tolerate sitting for more than ten minutes or so at a time; her capacities for standing and walking are significantly limited, as well. Certainly, considering that sedentary work is typically characterized by sitting for 6-8 hours of an 8-hour work day (generally at a desk), Dr. Barnes would **NOT** be capable of doing this type of work. Dr. Barnes and her doctor have continuously communicated to CIGNA that sitting for any extended duration of time is beyond Dr. Barnes' ability; for CIGNA to claim that Dr. Barnes can work in such a way, given her long history of back pain, which is aggravated by sitting and which worsened substantially by her continued work as a Research Scientist (which involved a great deal of sitting and working at a desk), and her significant back surgeries, including a fusion, with no appreciable improvement in her symptoms, it is evident that CIGNA not only fails to comprehend the nature and magnitude of Dr. Barnes' symptoms, but that they apparently refuse to credit any of her complaints, or the opinion of her doctor(s), in forming its determination. CIGNA's assertion that Dr. Barnes can work in a sedentary capacity is inconsistent with Dr. Joel's opinion (which is supported by a wealth of documented medical history) and Dr. Barnes' complaints and treatment history.

Dr. Barnes' pain, which can be triggered by something as insignificant as tying a shoe, or drying off from the shower, can render her unable to move or do anything; it occurs unexpectedly and leaves her incapacitated for anywhere from a minute to several hours. Her pain flares occur

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 24

frequently and must be addressed by significant pain medications; these, in addition to all the other medications she takes, produce a number of side effects which further complicate Dr. Barnes' condition and make functioning appropriately even more difficult.

If Dr. Barnes were to attempt to work, in addition to the pain she suffers constantly, she would have to endure frequent, sporadic pain flares, which would essentially cause her to shut down and cease whatever activity she would be involved with until the pain would subside. She would also suffer the side effects of her medications, which include experience dizziness, drowsiness, headache, nausea, lightheadedness, diarrhea, blurred vision, nervousness, vomiting, mood/mental changes, sweating, weakness, dry mouth, joint pain, stomach cramps, trembling, anxiety, memory loss, lack of coordination, and fatigue.

Furthermore, Dr. Barnes' reactive sleep disorder prevents her from getting the necessary restful sleep that she would need in order to recover from the stress of her day and participating meaningfully in a work setting; considering the toll any sort of activity takes on her body, even with the substantially limited activity she performs today, she would require a great deal of rest every night in order to function appropriately. As a result of her sleep disorder, the effects of which are magnified by her fatigue, Dr. Barnes does not get this restful sleep and therefore her pain and associated complaints, and her ability to function, are affected even more so.

Combined with the symptoms of her various other co-morbid conditions, CIGNA's assertion that Dr. Barnes could work in a sedentary position, if one were to consider what this would really entail, as described, is completely nonsensical. Dr. Barnes' pain, alone, would suffice to render her unable to work in any meaningful position; considering all of her other complaints, as well as the significant effects of the medications she must take on a regular basis, her condition certainly makes her an unsuitable candidate for any position, including those identified by CIGNA.

Dr. Barnes has already attempted to work through her constant, intractable pain. She worked tirelessly, through her pain, for as long as she could bear, and these efforts actually caused her condition to worsen. Dr. Barnes also adopted any and all modifications available to her at her job, including accepting a less demanding position, implementing more ergonomic workspace accommodations, and telecommuting, all of which failed to enhance Dr. Barnes' functionality. Dr.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 25

Barnes tried everything possible to remain working, for as long as possible, until she simply could not. Her severe pain and respective limitations prevent her from working as a productive employee at any job.

It is clear that Dr. Barnes is significantly limited in her abilities as a result of her conditions. Unfortunately, despite her best efforts, Dr. Barnes' condition has rendered her unable to participate in many aspects of life that she had previously enjoyed - including her work as a Research Scientist. Dr. Barnes' treating doctor, Dr. Joel, has indicated on numerous occasions that she cannot work at any job; the Social Security Administration's findings support this. It is incumbent upon CIGNA to consider all of Dr. Barnes' restrictions and limitations in evaluating her ability to work; given the serious nature of the surgeries she has undergone, the lack of improvement in her condition over the course of her treatment, the consistent opinion of her doctor, the magnitude of her medications, Dr. Barnes' complaints of pain, her proven commitment to working to the best of her ability in the past, the vast change in Dr. Barnes' lifestyle as a result of her disability, and her poor prognosis for the future, CIGNA is compelled to find that Dr. Barnes is totally disabled as she is clearly unable to work in any occupation for which she is reasonably fitted.

### D.    Dr. Barnes' Disabling Condition Continues

Dr. Barnes has made courageous attempts to remain working, often returning to work in the past and struggling to meet the demands of her position. Dr. Barnes possesses a strong work ethic and a passion for her work, and worked in spite of her condition for quite some time. However, Dr. Barnes' condition progressed to the point where she was forced to accept her limited functionality, and as a result has had to stop working as a result of her medical limitations.

Dr. Barnes' history surrounding her claim, her diligent efforts to persevere and return to work despite her limited functionality, serves to support the validity of Dr. Barnes' complaints; it is clear by her previous actions, and by her own admission, that she would prefer to return to than to accept her severely diminished functionality and resulting inability to perform the duties of any occupation for which she is reasonably suited. Dr. Barnes has gone to great lengths to improve her functional abilities, by utilizing virtually every treatment method available to her and implementing all

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 26

reasonable modifications, without any relief or improvement in her abilities.

Dr. Barnes has utilized many treatment methods and incorporated various modifications into her lifestyle, including physical therapy (including therapeutic exercise and ultrasounds), chiropractic treatment, acupuncture, biofeedback, use of electric stimulator, psychotherapy, use of a hot tub with bubble jets, massage therapy, and a limited amount of exercise (pilates movements, walking, swimming, as tolerated). Dr. Barnes has taken a "back class" and implemented a number of ergonomic adjustments, including an ergonomic evaluation of her office, use of an ergonomic chair and a slant board, and telecommuted to work in an effort to continue working with her limitations (these attempts were not successful or feasible). She endured a number of tests, including MRI's, X-Rays, a discogram, injections of both trochanteric bursa, epidural steroid injections into the lower back, radiofrequency ablation of the nerves in the facet joints, and, more notably, a number of invasive back surgeries, including microdisectomy, laminectomy, one-level anterior approach fusion, five levels of IDETT; and finally, numerous powerful medications which aim to improve Dr. Barnes' quality of life but often produce debilitating adverse side effects. Dr. Barnes at times stopped taking certain medications, suffering the loss of their benefit in order to evaluate whether or not they were causing her a more serious problem. Dr. Barnes has suffered a great deal, not only from her medical condition itself, but from the tireless efforts she made in attempting to improve her overall health and return to an acceptable level of functioning. Unfortunately, despite all of these efforts, Dr. Barnes has yet to experience any appreciable improvement in her condition; rather, as Dr. Joel has indicated, Dr. Barnes' condition has grown worse, and is expected to deteriorate further as time goes on.

Dr. Barnes made great attempts to return to work, despite her pain and the many difficulties she endured in simply trying to get through each day. She discussed her efforts, and her experience in returning to work, in her personal statement, wherein she states:

> Once I was back at work, I found that I was weak, still in pain, and still had all the same pain causing problems in my office. I started out full time but had to switch to part time because I was so fatigued and still in pain. Work was extremely anxious to assign me a bunch of studies and get me going. I wanted to show them that I could still work and really never

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 27

considered anything otherwise, but struggled inside with my pain. I did not like to complain about my pain.

<u>See</u> Personal Statement, annexed hereto as Exhibit "A."

It is obvious that Dr. Barnes tried diligently to return to work, despite her limited functionality, and that her sincere efforts were unfortunately not enough to overcome the reality of her situation; that the debilitating pain she endures daily prevent her from returning to work. However, her efforts can in no way be utilized in an attempt to rationalize that Dr. Barnes can work, simply because she was able to work for any period of time, while suffering from these conditions, that her condition is not disabling. Rather, her return to work was short-lived, involved a great deal of telecommuting, and her pain became so severe that continuing to put up such a valiant fight became impossible. Her continuing to work also exacerbated her condition, and her health has deteriorated further, as more invasive and extensive treatment options are now being considered in an attempt to improve Dr. Barnes' quality of life - although her treating doctor concedes that this will not contribute towards any improvement in functionality that might translate into the ability to work.

As courts have stated time and again, it is inappropriate to view a claim such as this in a vacuum, looking just at the immediate pre-disability time frame, for it would otherwise penalize a claimant for making "heroic efforts". <u>See</u> <u>Crespo v. UNUM Life Ins. Co. of America</u>, 294 F.Supp.2d 980, 997 (N.D. Ill. 2003). Dr. Barnes' condition continuously progressed and failed to respond to the multitude of treatment methods attempted throughout the course of her disability. Dr. Barnes certainly made "heroic efforts" in her futile attempts to triumph over her debilitating illness; unfortunately, while these efforts speak to her character, and further demonstrate the validity of her claim, Dr. Barnes' condition has progressed to the point where it is now impossible for Dr. Barnes to maintain any type of employment whatsoever with any reasonable continuity.

**E.**     **CIGNA's Denial of Dr. Barnes' Claim**

**1.**     **CIGNA Improperly Relied Exclusively Upon a Flawed IME**

Despite a wealth of supportive material provided by Dr. Barnes' treating physician, Dr. Joel, and various other doctors who have participated in Dr. Barnes' care over the course of her disability,

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 28

CIGNA chose to adopt the position of Dr. Justus C. Pickett, a biased, paid medical consultant employed by CIGNA for the purpose of evaluating Dr. Barnes' medical condition, in terms of her ability to work. See IME, annexed hereto as Exhibit "F."

## Dr. Pickett's Physical Examination of Dr. Barnes

Dr. Pickett met with Dr. Barnes, once, on May 4, 2006. Dr. Pickett generally recalled a portion of her medical history in his report, although he admitted that he did not have access to a complete set of her medical records. He also acknowledged that an MRI from 1992 revealed multiple disc disease at L3-L4, L4-L5, and L5-S1. In addition, he confirmed the finding of an MRI from 1994 which demonstrated an extruded fragment at the L5-S1 disc space. He discussed the progression of her condition, however, he often minimalized the severity of her condition and utilized misleading information that confused the actual facts surrounding Dr. Barnes' disability. There were multiple inaccuracies in Dr. Pickett's report, including those identified by Dr. Barnes' treating physician, Dr. Mannie Joel (discussed in greater detail below).

Dr. Pickett made references to a surgery Dr. Barnes underwent in 1994, after which "the left leg pain diminished but was not entirely gone, and she continued with low back pain which had now become predominant." While her back pain certainly was a main concern, Dr. Barnes' leg pain had not diminished; rather, her leg pain persisted and continued to be a problem for Dr. Barnes. In addition, Dr. Pickett was quite vague in his statements, offering opinions that, at certain times, Dr. Barnes was "not felt to be permanent and stationary" but failing to identify whose opinion he was reporting. This occurred on numerous occasions throughout his report.

As his report went on, Dr. Pickett continued to use misleading language that did not accurately report the details surround Dr. Barnes' disability. For example, Dr. Pickett referenced a discogram which "described pain at the injection of each disc," which quite simply does not make sense. Perhaps the report indicated that Dr. Barnes had experienced pain at each injection site, but the discogram itself was an imaging tool which revealed badly deteriorated discs; as an objective tool, it could not "describe pain." By this same indication, Dr. Pickett failed to convey the actual results of the discogram, minimizing the objective support this discogram offered in terms of Dr.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 29

Barnes' claim by focusing on subjective information. Considering that the results of this discogram, coupled with the pain Dr. Barnes was experiencing (which, Dr. Pickett acknowledged, was radiating into both legs and into the thoracic spine), led her treating doctors, at the time, to consider a three-level fusion surgery, these results are certainly relevant to her claim and therefore their omission from Dr. Pickett's report is puzzling.

Dr. Pickett went on to report that Dr. Barnes underwent a fusion surgery in December, 1997[2], and that postoperative visits through May, 1998 did not show a great deal of improvement. He also noted an increase in the L3-L4-L5 narrowing in September, 1999.

Dr. Pickett then began discussing Dr. Joel's care of Dr. Barnes, which began in July, 1999. He indicated that Dr. Joel put her under "aggressive-conservative care" at the outset of their treatment, which included modifying her medications, implementing a new treatment plan including epidural, sacroiliac injections, lumbar facet injections, and bilateral peritrochanteric injections. Dr. Pickett acknowledged that the epidural injections failed to provide long-lasting pain relief. Again, in June, 2000, a five-level discogram was carried out, from which Dr. Pickett noted "all [discs] were felt to be painful at the time." Again, while Dr. Pickett's language minimizes the objective nature of these results, the discogram revealed badly deteriorated discs at all levels. Dr. Pickett acknowledged that Dr. Barnes later underwent IDETT procedures, which failed to yield any appreciable long-lasting improvement.

Dr. Pickett, again, used misleading language when he went on to write that, "in August of 2001, he felt she was probably permanent and stationary in 30-60 days (but she was not)." He then wrote that Dr. Joel had stated that Dr. Barnes could function in a light capacity (which Dr. Joel later refuted in his response to the IME, where he stated that Dr. Barnes cannot work in any capacity). These statements are unclear and confusing, as they do not offer any further explanation.

He acknowledged, however, that in January, 2002, Dr. Joel declared Dr. Barnes permanent and stationary, indicating that Dr. Barnes was 100% disabled, could only do limited work at home,

[2]    This is incorrect; Dr. Barnes' fusion surgery was actually performed on January 7, 1998. This inaccuracy demonstrates Dr. Pickett's lack of familiarity with Dr. Barnes' medical history, and his failure to perform a thorough review of Dr. Barnes' disability.

# FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 30

sit for a maximum of 20 minutes at a time, and could only work in a very ergonomic workstation (from home).

As he concluded his record of her treatment history, however, Dr. Pickett sought, again, to minimize Dr. Barnes' condition, where he wrote that, since February, 2006, "in the multiple visits between the lidocaine infusion then and over the past two years she has simply had her medications refilled." Again, this is erroneous, as Dr. Joel has been involved in monitoring her condition for changes, refilling medications, and exploring new treatment options with Dr. Barnes, including an implanted spinal stimulating device, which is now being seriously considered as the next step in her treatment plan. Indeed, there is not much more that can be done, as Dr. Barnes has showed no improvement in her condition, despite two quite invasive major back surgeries, multiple injections and other treatment options, and a significant medication regimen, and her treatment is now oriented towards maintaining her current (low) level of functioning; however, to state that her care has consisted of "simply" having medications refilled is incorrect. In addition, Dr. Pickett did not report an accurate and exhaustive list of all the medications that Dr. Barnes takes on a regular basis.

Dr. Pickett demonstrated his inability to perform a full examination of Dr. Barnes as he continued to omit relevant details of her medical history in formulating his report. Quite alarmingly, Dr. Pickett noted, under "Past Medical History," that "except for the gynecological procedures and a bunionectomy on her right foot she has had no other surgical procedures." However, Dr. Pickett failed to even mention at that point that Dr. Barnes had undergone two open back surgeries by two separate surgeons; although referenced briefly earlier in his report, this certainly should have been noted, as should the numerous injections, IDETT procedures and various other treatment methods utilized by Dr. Barnes' physicians in the past. He also failed to consider the various other medical conditions Dr. Barnes has suffered from in the past, including endometriosis, multilevel lumbar disc disease, neuropathic pain, myofascial syndrome with myofascial cervicogenic headaches, posterior compartment syndrome, reactive sleep disturbance, depression, intermittent cognitive impairment, and various other conditions. Dr. Pickett failed to consider, or even mention, any of these conditions in reaching his determination as to Dr. Barnes' ability to function in a work environment.

Even more inaccuracies are revealed as Dr. Pickett's report continues, particularly upon his

Lorraine Adell Harris
February 9, 2007
Page 31

physical examination of Dr. Barnes, where he erroneously claimed that atrophy was not seen (addressed below by Dr. Joel) and that the pelvis "seemed" level; this uncertainty is cause for concern as to the validity of Dr. Pickett's reported findings. He also acknowledged hypesthesia about the left heel, then quickly noted that no other sensory changes were noted, in an effort to minimize this observation. In similar fashion, Dr. Pickett used minimizing language where he acknowledged that there was "some degree" of tenderness at L5-S1, less at L4-L5, and slightly at L3-L4. His attempt to disguise the significance of tenderness at not one, but three lumbar disc levels, more noticeable at each lower disc level, is apparent.

Similar to his scant reporting of Dr. Barnes' past medical history, Dr. Pickett (under "Imaging Studies Reviewed") listed only MRI scans from 2003; it is apparent that, perhaps, Dr. Pickett never actually reviewed the MRI scans from 1997, nor did he physically see or review the discograms and multiple MRI scans that were taken at certain points in time during Dr. Barnes' treatment. He did acknowledge that the MRI's from 2003 demonstrated some disc bulges but minimized this finding by noting that "nothing of any significance was noted at that level." (This remark is completely inaccurate, as all of the doctors involved in treating Dr. Barnes found this MRI to be quite significant.)

### Dr. Joel's Response to CIGNA's IME Results, dated May 19, 2006

When asked by CIGNA to respond to Dr. Pickett's IME report, Dr. Barnes' treating physician, Dr. Joel, indicated that he did not agree with the findings, and provided a four-page letter to explain his opinion. See Dr. Joel's Response to IME, dated May 19, 2006, annexed hereto as Exhibit "G." Dr. Joel took issue with CIGNA's failure to notify him prior to the evaluation, rendering Dr. Joel unable to provide Dr. Barnes with relevant materials, etc. He also raised ethical concerns as to the validity of Dr. Pickett's findings, considering his inherent conflict of interest as a paid consultant of CIGNA, which serves to benefit financially from each terminated claim, such as Dr. Barnes'. Dr. Joel reiterated that Dr. Barnes had been declared disabled since 2001, as no treatment had yielded any improvement since that time. Dr. Joel explained that treatment of Dr. Barnes is oriented towards maintaining her very low level of functioning, with the help of numerous

# FN

## Frankel & Newfield, P.C.

Lorraine Adell Harris
February 9, 2007
Page 32

medications, including OxyContin and hydrocodone, which are prescribed through his office.

Dr. Joel reviewed his own medical file of Dr. Barnes and re-examined her on May 19, 2006 prior to submitting his report to CIGNA. He recalled her history of two open back surgeries, which failed to improve her condition, as well as multiple other spinal procedures and trials of multiple medications, physical therapy and supportive counseling. Once these methods were clearly not improving her condition, Dr. Joel declared her permanent and stationary.

Dr. Joel explained that once her condition failed to respond favorably to various surgical procedures, hers was no longer an orthopedic problem; rather, her problem was due to unrelieved pain and sometimes due to her medications. Therefore, Dr. Joel indicated that CIGNA's designation of Dr. Pickett to perform the IME was not appropriate, as orthopedic surgery was not the correct area of expertise in evaluating a case such as Dr. Barnes', where the consultant should have been qualified in pain management medicine, so as to focus more on the neurological, rather than mechanical, aspects of the spine. In addition, Dr. Joel felt that a proper review could not take place without a complete set of medical records, which, by Dr. Pickett's own admission on page 2 of his report, he did not have at the time he examined Dr. Barnes.

Dr. Joel indicated that the physical examination administered by Dr. Pickett was incorrect and incomplete. Most significantly, Dr. Barnes took OxyContin, a narcotic prescribed to her for pain, prior to the examination by Dr. Pickett. Therefore, the OxyContin provided her with a reasonable amount of pain relief during the examination; had she not taken the medication right before the examination, the results would have differed a great deal.

Dr. Joel agreed with Dr. Pickett's finding that Dr. Barnes has decreased range of motion of the lumbar spine and symmetrical deep tendon reflexes. He disagreed with Dr. Pickett's assertion that there was "no atrophy seen," based upon measurements of Dr. Barnes' thigh. Dr. Joel explained that Dr. Pickett did not elaborate on the method by which he measured her thigh, as measuring in this way can be difficult. To resolve this discrepancy, Dr. Joel measured Dr. Barnes' thigh during his evaluation that day, utilizing the standard method of reading the circumference at a fixed distance from the patella, and found that there was, indeed, a difference in the circumference of each leg, with the right thigh measuring 18.5 inches and the left 17.5, demonstrating atrophy of the left leg.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 33

Dr. Joel also tested Dr. Barnes' motor strength, and conveyed his perplexity at Dr. Pickett's failure to conduct such a relevant test. Dr. Barnes demonstrated weakness in hip extension on the left side at 30% decreased, upon examination by Dr. Joel. Her flexion and extension on the left side was decreased 30% at the knee, and her left ankle showed weakness in both plantar and dorsiflexion. In addition, Dr. Joel noted that Dr. Pickett chose not to check for tenderness at the facet joints or the SI joints, noting that these are constantly 2-3+ tender. He also noted that her sciatic notches bilaterally are also very tender.

Dr. Pickett's ultimate diagnosis of "failed diskectomy and L5-S1 fusion" was inadequate, Dr. Joel explained, as he considered this a strictly orthopedic diagnosis that failed to consider Dr. Barnes' various other diagnoses, including posterior compartment syndrome (i.e. SI and facet joints), neuropathic pain, myofascial syndrome (that is extensive) resulting in myofascial cervicogenic headaches, cervical disease, reactive sleep disturbance, depression, and intermittent cognitive impairment secondary to her intractable pain and possible her medications.

In his conclusions, Dr. Pickett indicated that he felt her pain complaints and abilities were only partially supported by objective findings, which Dr. Joel found to be inaccurate. He noted that Dr. Pickett based this on a functional capacity evaluation that Dr. Pickett, himself, completed based entirely upon his own opinion. He pointed out that Dr. Pickett acknowledged that Dr. Barnes was able to move fairly well because she had just taken her medications, and that she laid down in a left lateral fetal position immediately after the examination. He also highlighted Dr. Pickett's admission that Dr. Barnes did not demonstrate any symptom magnification during the examination.

Dr. Joel discussed Dr. Pickett's finding, that Dr. Barnes has the capacity for a full-time sedentary job, which Dr. Joel opined must have stemmed from Dr. Pickett's erroneous belief that Dr. Barnes can tolerate sitting continuously, which, he wrote, is "very far from the truth;" although, he wrote, Dr. Pickett must have noted that Dr. Barnes changes her position all the time and gets up and lies down. Dr. Joel indicated that, in reality, as documented in her medical records numerous times, Dr. Barnes can only tolerate sitting for ten minutes and then must change her position, which would obviously prevent her from sitting at a desk. With extreme effort, Dr. Joel noted that Dr. Barnes can tolerate sitting for fifteen minutes straight only a few times a day. He therefore found

# FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 34

it incomprehensible, given his restrictions of Dr. Barnes' standing and walking to 20-30 minutes at a time, and sitting to 10-15 minutes at a time, that Dr. Pickett could find Dr. Barnes capable of spending eight hours each day working in a sedentary capacity.

In addition, Dr. Joel indicated that Dr. Pickett, as a result of his specialty in orthopedic surgery being outside the scope of what he considered Dr. Barnes' true medical problems, failed to pick up on Dr. Barnes' problem of intermittent cognitive impairment, which he noted is well-documented in her medical records. As a result of these limitations, Dr. Joel opined that Dr. Barnes would be unfit for any job where cognition is important, which he explained accounted for 100% of the jobs he could think of. He also noted that, because of these cognitive impairments, he had instructed Dr. Barnes not to drive, except when absolutely necessary, which he understood was a reality of her situation.

Dr. Joel emphasized, again, his finding that Dr. Barnes is 100% disabled, and that he could not identify any type of meaningful employment that she would be able to tolerate due to her pain, which is intractable and requires special circumstances. He also attributed her inability to work to her intermittent cognitive impairment, which is aggravated by the effects of her medications. He noted that the only work he could conceive of her doing would be short periods of work, at home, with a very ergonomic situation, which would require no more than 20 minutes of sitting with multiple breaks to lie down after a period of 20 minutes. On a "good day," Dr. Joel indicated that she might be able to do a maximum of a couple of hours (added together), as well as some days where she would not be able to work at all. In addition, she would find memorizing and concentrating difficult. See Dr. Joel's Response to IME, annexed hereto as Exhibit "G."

Obviously, Dr. Joel's opinion is in stark contrast to that of Dr. Pickett; however, despite Dr. Joel's long history of medical treatment of Dr. Barnes, his great familiarity with her medical condition, his testimony as to the deterioration of her overall health over time and the worsening of her condition, and his careful review of all of her medical records (which Dr. Pickett did not perform), CIGNA saw fit to simply adopt the position of Dr. Pickett, who only met Dr. Barnes once, and terminate her claim on the basis of his report. It is questionable, then, as to why CIGNA even requested a response from Dr. Joel regarding the findings of Dr. Pickett's IME, considering it did