FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 35

not receive proper consideration in the overall review of Dr. Barnes' claim.

Essentially, CIGNA completely ignored the opinion of Dr. Joel, thereby violating Dr. Barnes' rights under ERISA.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003).  There, while the Supreme Court rejected the notion that an insurer must accept the opinion of a claimant's treating physician, it affirmed that the insurer cannot simply refuse to credit the reliable evidence of a claimant, including the opinion of a treating physician with a long standing relationship that has witnessed the worsening of a claimant's condition, as here.  Id. at 832.

CIGNA is compelled to take Dr. Joel's consistent opinion regarding Dr. Barnes' condition into account, as his experience in treating her various medical complaints provides a great deal of insight into the reality of her medical condition.  Dr. Joel, not Dr. Pickett, is in a better position to shed light on Dr. Barnes' ability to work, and CIGNA's refusal to lend proper credence to his opinion, in favor of a paid medical consultant who was not even appropriately qualified for evaluating Dr. Barnes' condition, is erroneous and violates Dr. Barnes' rights as a beneficiary under ERISA.

## Dr. Pickett's Erroneous Conclusions Unfairly Influenced CIGNA's Claim Determination

Dr. Pickett's report of Dr. Barnes is not only incomplete, but inaccurate and misleading. Most significant to this conclusion is the fact that Dr. Barnes took pain medication immediately prior to the examination.  This allowed Dr. Barnes to tolerate the evaluation far more easily than she would have without these powerful medications.  Any notations by Dr. Pickett as to Dr. Barnes "moving around reasonably well" can be attributed to this fact.  Dr. Pickett even acknowledges this in his report.

However, despite Dr. Barnes' greater tolerance for the evaluation as a result of the pain medication, Dr. Pickett still acknowledged that Dr. Barnes demonstrated physical evidence of disability.  He claimed that Dr. Barnes' pain complaints and abilities were "only partially supported by objective findings in that, having taken her medications, she was able to move fairly well and with not too much pain at this time although after the examination she immediately laid down in the left

 FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 36

lateral curled position while we went to examine the magnetic resonance images." This statement, in response to the question "are the claimant's reported pain complaints and abilities supported by the objective findings on examination?" is quite significant, as Dr. Pickett not only acknowledges some objective support for her disability, but admits that her complaints being only "partially supported" is attributable to the fact that she had recently taken her pain medication. He offered that her ability to move fairly well and tolerate the evaluation without much pain was the result of this medication, and that towards the end of the evaluation, presumably as Dr. Barnes' medications began to wear off, she had to change her position to the fetal position in order to cope with the pain. (Obviously, if Dr. Barnes were at some hypothetical job and was compelled to assume such a position to achieve pain relief, such behavior would not be tolerated or deemed acceptable in the vast majority of work positions in this country.) It would follow logically that, by Dr. Pickett's claim here, had Dr. Barnes not taken her medications and her symptoms and complaints of pain were more evident, her complaints and abilities would likely be fully supported by objective findings.

It is also important to note that Dr. Pickett had not conducted a full review of Dr. Barnes' objective medical history, including a number of MRI and discogram results that demonstrate further objective support for her disability.

Dr. Pickett, when asked to comment on Dr. Barnes' abilities to move during the exam, responded that Dr. Barnes moved reasonably well, getting up and down off the exam table "slowly but carefully," using her arms to support getting up and down. He also noted that her "facial grimacing was not felt to be unusual." This comment is oddly put, as most would consider any facial grimacing to be somewhat remarkable. When asked to comment on Dr. Barnes' attitude, Dr. Pickett responded that Dr. Barnes cooperated fully and did not demonstrate any symptom magnification.

Despite his finding that Dr. Barnes did have impairments and that her complaints were, at the very least, partially supported by objective findings, as well as the multitude of subjective support he identified over the course of his examination, combined with the consistent support of Dr. Barnes' physicians, Dr. Pickett somehow reached the erroneous conclusion that Dr. Barnes is capable of working in a sedentary capacity at a full-time job. While he failed to identify any such position, he limited her potential job to one where she could sit continuously with the opportunity to change

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 37

positions frequently due to increasing pain, as well as accommodate her need for hourly breaks, often lying down, with further restrictions for standing, walking, pulling, pushing, and reaching up and down at desk level.

It is apparent, by his biased and unsubstantiated opinion, that Dr. Pickett did not take any of the supportive medical information provided by Dr. Barnes' physicians, nor did he acknowledge Dr. Barnes' poor tolerance for sitting. In addition, Dr. Pickett arbitrarily concluded that Dr. Barnes could work in a sedentary capacity under a number of specific restrictions and limitations, without giving any consideration whatsoever to whether or not any such sedentary positions even exist.

Dr. Joel articulated a number of issues with Dr. Pickett's report which seriously call into question the validity of his examination (as discussed in great detail above). Dr. Pickett's bias is evident by the language he utilized in an effort to misconstrue or minimize the medical findings that are especially supportive of Dr. Barnes' claim, as well as the disregard he, and CIGNA, demonstrated for the opinions of Dr. Barnes' treating physicians, especially Dr. Joel. Furthermore, as Dr. Joel explained, Dr. Pickett, as an orthopedic surgeon, is not even properly qualified to conduct such a review of Dr. Barnes' condition(s), as her medical problems would have been more appropriately evaluated by a pain management specialist, one who is generally concerned with the neurological and other mechanisms of spinal conditions, rather than simply the mechanical aspects of the spine.

For these and the multitude of other reasons outlined above, the medical examination performed by Dr. Justus Pickett was improper, and, as a result, did not yield results that are an accurate indicator of Dr. Barnes' functional abilities. As this invalid report served as a basis for several other facets of the decision-making process, particularly the peer medical review and transferrable skills analysis, the entire claim process was tainted and led CIGNA to reach the incorrect determination that Dr. Barnes could work in a sedentary full-time capacity.


FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 38

### 2. CIGNA Performed a Flawed, Biased Paper Review of Dr. Barnes' Records
### Dr. Waltrip's Peer Review

On August 4, 2006, CIGNA employed Dr. Robert L. Waltrip to review Dr. Barnes' medical records. See Peer Review, annexed hereto as Exhibit "H." Dr. Waltrip's report essentially documented the history of Dr. Barnes' disability, while acknowledging a number of symptoms, treatment methods employed and objective evidence that supports Dr. Barnes' significant restrictions and limitations.

Among other things, Dr. Waltrip acknowledged that Dr. Barnes' MRI of November 30, 1994 revealed "a large L5-S1 fragmented disc herniation with milder L3-4 and L4-5 disc dessication." (This finding is interesting, as in Dr. Pickett's IME, he reported the MRI showing "some minimal disc bulges but nothing of any significance was noted at that level." This seriously calls into question the validity of Dr. Pickett's findings.) Dr. Waltrip also acknowledged a repeat MRI of March 5, 1996 which "continued to note multilevel degenerative process," as well as a lumbar discogram on June 20, 1996 which was positive at L3-4, L4-5 and L5-S1. (These findings were similarly minimized in Dr. Pickett's report.)

Dr. Waltrip referenced Dr. Barnes' L5-S1 anterior fusion surgery with bone graft, which was performed on December 13, 1997[3]. He recalls that Dr. Barnes did not achieve complete relief of her pain following that surgery, that she subsequently suffered from lower extremity paresthesias, and continued to experience pain for which she required the regular use of medications. In addition, she was diagnosed with left tarsal tunnel syndrome, following persistent left ankle numbness and bilateral foot complaints.

Dr. Waltrip indicated that Dr. Barnes continued to utilize different medications, including OxyContin and Methadone. He also wrote that Dr. Barnes had continued to demonstrate findings of decreased sensation along the L5-S1 and L4-5 dermatome, left leg weakness and antalgic gait.

---

[3]    Again, CIGNA incorrectly reported that Dr. Barnes' surgery took place on December 13, 1997; it actually took place on January 7, 1998. It appears that CIGNA failed to properly differentiate between the discectomy surgery she underwent in December, 1994 and the anterior interbody fusion surgery she underwent in January, 1998.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 39

He noted that she was not able to sit for any length of time, and that she suffered periodic exacerbations with increased pain.

Dr. Waltrip then referenced a CT evaluation from September 16, 1999 which noted foraminal encroachment, epidural fibrosis, posterior listhesis of L5 on S1, degenerative changes at L3-4 and degenerative changes at L4–5. He also referenced a radiofrequency ablation procedure at L4-5 and L5-S1 on November 19, 1999 and selective lysis of adhesions at L5-S1 on January 5, 2000. Dr. Waltrip noted that Dr. Barnes failed to improve and was diagnosed with failed back syndrome. After undergoing additional lumbar steroid injections in 2001, Dr. Waltrip wrote, Dr. Barnes continued to treat conservatively for **significant functional deficits and remained disabled**. He noted that Dr. Barnes' disability included cognitive impairment secondary to her medication use.

In addition, Dr. Waltrip remarked that the lumbar discogram performed on September 13, 2000 revealed five concordant discs from L1-S1, which required extensive therapeutic intervention and continued use of multiple medications. Despite these methods, Dr. Waltrip noted that Dr. Barnes remained symptomatic. He recalled Dr. Joel's indication that Dr. Barnes would not be able to work in any capacity, as she would be unable to stay in any one position for more than a few minutes.

Finally, Dr. Waltrip referenced a Functional Capacity Test, performed in September, 2001, which erroneously found Dr. Barnes capable of working in a "light" capacity. [Obviously, such a finding is ludicrous, considering not only the consistent opinion of Dr. Barnes' treating physicians who have found Dr. Barnes incapable of working in ANY occupation; and, more telling, CIGNA's IME doctor, Dr. Justus Pickett, who found that Dr. Barnes "has findings consistent with a failed back syndrome with the inability to perform any occupational endeavors beyond that of a full time sedentary level as defined by the U.S. Department of Labor." See IME Report, annexed hereto as Exhibit "F."

Not only did the FCE findings contradict any and all medical opinions of any medical doctors who met or treated Dr. Barnes, but its findings are inconsistent with what actually occurred during this test. The FCE administrator observed Dr. Barnes lying down and changing position at various points during the examination, and noted that she demonstrated some level of discomfort. He noted

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 40

that she maintained a jovial and upbeat attitude, and utilized this, combined with minimal discrepancies between her own perceived abilities and her actual demonstrated abilities during the test, to rationalize that Dr. Barnes was capable of working in a light capacity. The administrator (a physical therapist, not a medical doctor) failed to consider that Dr. Barnes might be capable of certain activities one time, for the purpose of evaluation, but certainly not on a full-time basis for a full 8-hour work day. In addition, the physical therapist failed to acknowledge the severity of the quite extensive surgeries Dr. Barnes had undergone and how extended periods of sitting, or most any activity, would most certainly affect her in a work environment.

Because of the obvious flawed reasoning utilized in this FCE, this finding was not utilized in making a decision as to Dr. Barnes' disability during the more recent review of her claim; however, this finding was referenced by Dr. Waltrip as having influenced the outcome of his report. Given that it conflicts with even the findings of Dr. Pickett, CIGNA's IME doctor, who found that Dr. Barnes could not work in any capacity beyond that of a sedentary level, consideration of the flawed FCE in any manner whatsoever toward the final outcome of Dr. Barnes' claim determination, whether by influencing a medical report or otherwise, was improper.]

Interestingly, even the FCE was only mentioned briefly in the course of Dr. Waltrip's report, and his recollection of Dr. Barnes' medical history and conditions were quite lengthy, Dr. Waltrip's eventual conclusions completely contradicted the tone of his report up to that point, where Dr. Barnes' substantial medical issues were discussed in great detail. Rather, upon concluding his report and forming his opinion, Dr. Waltrip deferred to Dr. Pickett, who performed a flawed, invalid IME, which erroneously found Dr. Barnes capable of working in a sedentary capacity. His opinion largely mirrors that of Dr. Pickett, despite the fact that Dr. Waltrip had far greater access to Dr. Barnes' medical records, which include a number of diagnostic tests that support her disability, as well as the long history of material that speaks to her inability to perform most activities and her continued complaints of pain, despite substantial medication use.

This is troublesome for a number of reasons; first and foremost, Dr. Pickett did not conduct a full review of Dr. Barnes' medical records, or her medical history, and therefore Dr. Waltrip's deferral to Dr. Pickett was improper. In fact, Dr. Waltrip's remarks, which were based on a more

Lorraine Adell Harris
February 9, 2007
Page 41

complete volume of information, more accurately reflect the severity of Dr. Barnes' condition. In addition, because of the numerous inaccuracies contained within Dr. Pickett's report, Dr. Pickett's findings themselves are tainted, and do not provide correct information as to Dr. Barnes' functional abilities. Therefore, as Dr. Waltrip utilized Dr. Pickett's erroneous report as a basis upon which he formed his own conclusions, Dr. Waltrip's report was based on a flawed, invalid premise, rendering his own findings flawed and invalid as a result. In addition, Dr. Waltrip's review of Dr. Barnes was not, at all, independent; rather, it just served to support Dr. Pickett's finding. Rather than give his own objective view of Dr. Barnes' medical records, as one would expect in the interest of fairness, CIGNA provided Dr. Waltrip with Dr. Pickett's IME in an effort to skew the results of his report in its favor. Dr. Waltrip's review and Dr. Pickett's examination should have been separate, independent reviews of Dr. Barnes' disability, but rather one biased review was used to support an additional review (by Dr. Waltrip) which, up until the consideration of Dr. Pickett's IME, was completely supportive of Dr. Barnes' disability claim. One must wonder, then, why CIGNA would even go so far as to request a review by Dr. Waltrip, if the outcome merely served to mirror the opinion of Dr. Pickett?

In addition, Dr. Waltrip's remark that "it is unclear why the claimant was changed by Dr. Joel to total disability and why he feels now the claimant is 'unfit for any job'" is further cause for concern, as Waltrip seems unable to accept Dr. Barnes' disability without some specific, "disabling event" that occurred. Despite acknowledging the significant medical problems that Dr. Barnes suffers throughout his report, Dr. Waltrip apparently sought to find some way to justify his exclusive adoption of Dr. Pickett's opinion and apparent disregard for that of Dr. Joel.

In a recent case, Wuollet v. Continental Casualty Corp., 360 F.Supp.2d 994 (D. Minn. 2005), the Court found the peer review of the claimant's records that was utilized in the course of the claim determination to be improper. In Wuollet, the court took issue with the reviewing doctor's approach to evaluating the claimant's disability, where he was unable to see "any reason why [Wuollet] stopped working"; or "a specific reason why [Wuollet] suddenly stopped fully working." The Court found this assertion troubling, where the reviewing doctor claimed that disability did not exist as there was not one specific trauma that caused the claimant's disability. The Court went on to say

**FN** FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 42

that "apparently, he was searching for some event that caused Wuollet's disability and it seems that nothing short of such an event would have convinced him that she was disabled." This demonstrated the doctor's inexperience and bias and led the Court to consider his findings "inexplicable." By Dr. Waltrip's refusal to credit Dr. Joel's opinion for lack of some "event" that warranted designating Dr. Barnes as "totally disabled," Dr. Waltrip's conduct would similarly be deemed "inexplicable" by the court.

See also Haberman-Hall v. Continental Assurance Co., 2003 U.S. Dist. LEXIS 6310 (D. Minn.), where the Court found that the insurer's failure to take into account Ms. Haberman-Hall's subjective complaints of pain constitutes an abuse of discretion. Instead, as here, the insurer's reliance upon on a paper review, the Court found, "is poor evidence of the pain a person experiences." Considering that Dr. Pickett's IME largely minimized Dr. Barnes' pain, which was masked by her strong pain medications she had taken just prior to the exam, Dr. Waltrip's peer review failed to adequately resolve these issues and thus lent itself towards an improper result.

Dr. Waltrip, in reaching his conclusion, offered only excerpts from Dr. Pickett's IME report to rationalize his erroneous position that Dr. Barnes could work in a sedentary capacity. He argued that because Dr. Barnes was noted to be able to "move fairly well and in not much pain" during the IME (which was attributed to Dr. Barnes' recent dose of pain medication), Dr. Joel's opinion that Dr. Barnes is unfit for any job and that she cannot sit for greater than ten minutes was incorrect. However, he later found that Dr. Joel's recommendation for no prolonged sitting, walking, or standing was reasonable; this, however, contradicts his own finding that sedentary work is appropriate. Sedentary work requires prolonged sitting for the majority of the day (6-8 hours of an 8 hour work day), with standing and walking accounting for any remaining time. Therefore, Dr. Waltrip's finding, by his own acknowledgment, is inexplicable.

Dr. Waltrip also indicated that Dr. Barnes should not perform any climbing, kneeling, bending, squatting or stooping, and that she should have the opportunity to change position

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 43

throughout the day[4]. Dr. Waltrip noted that he was unable to comment on cognitive impairment (which, in effect, was not a consideration in his opinion as to Dr. Barnes' disability) and that, from an orthopedic standpoint, sedentary work appears to be reasonable.

Despite Dr. Joel's identifying the issue of whether or not an orthopedic surgeon was an appropriate choice in evaluating Dr. Barnes' claim, here, CIGNA chose to employ a **SECOND** orthopedic surgeon to perform the peer review, essentially dismissing Dr. Joel's concern without explanation. Dr. Joel indicated that in order for CIGNA to perform a full and fair review of Dr. Barnes' disability, it would be appropriate to utilize a physician who specializes in pain management medicine, rather than orthopedic surgery, to evaluate Dr. Barnes' condition, as a pain management doctor would have different methods of evaluating such a condition than an orthopedic surgeon would. For the purpose of evaluating Dr. Barnes' condition, an orthopedic surgeon was **NOT** the appropriate individual to have review her records, especially considering that another orthopedic surgeon had performed the IME on CIGNA's behalf. In this manner, Dr. Joel's concerns were not addressed and the issues surrounding Dr. Barnes' disability were not properly evaluated or considered.

In essence, Dr. Waltrip's report, and findings, regarding his opinion of Dr. Barnes was improper and did not provide a fair, unbiased opinion as to Dr. Barnes' functional ability. Dr. Waltrip, who was not even qualified in the appropriate specialty by which to properly evaluate her disability, ignored a wealth of supportive material for Dr. Barnes' claim and simply adopted the position of Dr. Pickett, another orthopedic surgeon, who only met Dr. Barnes once as arranged by CIGNA. Dr. Waltrip's report did not accurately identify Dr. Barnes' respective limitations and

---

[4]    He noted that "most claimants with an inability to sit for prolonged periods of time are able to adjust their position and tolerate longer periods of sitting." This statement is not substantiated by any reliable support for this opinion, rather, it appears that Dr. Waltrip reached this assumption without identifying how and when this ability to adjust their position, contributing to greater tolerance for sitting, takes place. He also assumed, without justification, that a position exists where Dr. Barnes would be capable of adjusting her position, and his speculation that this would cause her to increase her tolerance for sitting is also nonfactual but merely his own unsupported opinion.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 44

restrictions and led to the erroneous conclusion that Dr. Barnes is capable of working in a sedentary capacity, which she is not.

## CIGNA's Initial Review of Dr. Barnes' Condition Was NOT Considered by Dr. Waltrip

Despite Dr. Waltrip's reliance upon a great deal of medical information dating from 2001 (and from years prior), Dr. Waltrip did not consider a peer review performed in July, 2001 by two medical professionals employed by CIGNA, Judy Porreca, R.N. and Dr. Thomas Franz.

In the review completed by Nurse Judy Porreca, Ms. Porreca found that "upon isolating and interpreting the medical documentation, these records do demonstrate a significant diagnosis, and it is reasonable that limitations could result from the same... It is telling that the surgical recommendation of an anterior posterior fusion is recommended given the Cx's stated age at that time. Even as this surgical procedure did not take place, a significant... fusion did." See Inter-Office Memo from Judy Porreca, R.N., dated July 12, 2001, annexed hereto as Exhibit "."

Dr. Thomas Franz reviewed Dr. Barnes' medical records on July 18, 2001. Upon reviewing notes from Dr. Barnes' treating physicians, a peer review completed by Dr. Strizak, extensive diagnostic studies, etc., Dr. Franz found significant "the extensive evidence of degenerative disc disease and instability with fairly aggressive recommendation for a three level fusion as well as the heavy use of opiate medication all pointing to significant painful degenerative disease." He noted that "it is reasonable that the patient was more limited and should have been precluded from working before it was first mentioned in the record." He went on to note that her documented degenerative disc disease, medication use and recommendation for surgery supports finding her reasonably incapacitated at the time of her departure from the workplace. See Physician Case Review by Thomas Franz, M.D., dated July 18, 2001, annexed hereto as Exhibit "J."

Considering Dr. Waltrip's inclusion of a clearly improper FCE, which does not accurately reflect Dr. Barnes' abilities, in his review of her records, but CIGNA's failure to provide these reports (or Dr. Waltrip's failure to include them) in his review is inexplicable and inexcusable. Clearly, these reports, which were produced at CIGNA's direction, by CIGNA's in-house medical

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 45

personnel, were relevant to Dr. Barnes' claim. Since the time of these reports, Dr. Barnes' pain has persisted and her condition has continued to worsen. Therefore, any findings that were valid at that point in time are still valid, if not more so than in 2001. The exclusion of these relevant materials from consideration in Dr. Waltrip's report renders his report, and opinion, improper and unreliable. CIGNA's reliance upon his opinion at any point during its investigation of Dr. Barnes claim (as took place during the TSA/LMS portion of the process) renders its ultimate decision similarly tainted.

3. **CIGNA Performed a Flawed, Inaccurate Transferrable Skills Analysis and Relied Upon its Incorrect Findings in its Determination**

On May 31, 2006, CIGNA performed a Transferrable Skills Analysis, applying Dr. Barnes' "transferrable skills" to a number of positions in the labor market of San Francisco, California, which it claimed she would be capable of performing. See Transferrable Skills Analysis, annexed hereto as Exhibit "K." This TSA report was erroneous in numerous respects, with significant flaws throughout, and cannot be used as a reliable basis for reaching any determination regarding Dr. Barnes' employability, and certainly not for a determination regarding her claim for disability.

Most significantly, CIGNA's Transferrable Skills Analysis, performed by Vince Engel, a rehabilitation specialist, was based upon the erroneous conclusion, put forth by CIGNA, that Dr. Barnes is capable of working in a sedentary capacity. This finding is incorrect, as discussed in greater detail throughout this appeal, and in effect led to an improper finding in the TSA (and peer review) and any other aspect of the claim process that relied upon the flawed, improper IME to base information about Dr. Barnes' functional ability. CIGNA's reliance upon this flawed, invalid premise in performing the TSA renders its findings similarly invalid, as it is not a true representation of how Dr. Barnes' transferrable skills are affected by her medical condition, and as such does not accurately indicate Dr. Barnes' ability to work in the positions identified by CIGNA.

CIGNA's TSA relied heavily upon the findings of Dr. Pickett, who performed the IME of Dr. Barnes, and therefore adopted his opinion as to Dr. Barnes' restrictions and limitations. As his findings were incorrect, CIGNA therefore did not properly consider Dr. Barnes' true restrictions and limitations, nor did it consider the effects of Dr. Barnes' medications, on her ability to perform the

Lorraine Adell Harris
February 9, 2007
Page 46

duties of any occupation. In its TSA report, CIGNA identified Dr. Barnes' restrictions and limitations as "functioning at the sedentary level of physical demand with the need to change positions from sitting to standing on a regular basis," as well as Dr. Barnes having "full use of her upper extremities for reaching at desk level, fine manipulation and simple and firm grasping." Mr. Engel failed to consider restrictions and limitations including Dr. Barnes' inability to sit for extended periods of time, inability to drive (except for a very short distance and only when absolutely necessary), and further restrictions on the amount of time Dr. Barnes can spend standing or walking continuously. He also failed to address Dr. Barnes' inability to bend, squat, kneel, climb, reach, work on uneven terrain or heights, or perform repetitive movements (feet or hands/arms). In addition, Mr. Engel did not consider Dr. Barnes' cognitive dysfunction, which includes her inability to concentrate, which affects her ability to think critically and process tasks, her headaches, or lack of energy and, more significantly, her intense fatigue, both of which prevent her from sustaining a full work day. See Dr. Joel's Treatment/Medical Records of Dr. Barnes, annexed hereto as Exhibits "B," "C," "D," and "G," respectively.

It is obvious, then, that none of Dr. Barnes' treating physicians' opinions, or any of their medical records, were properly considered by Mr. Engel as he conducted his TSA, and in effect the TSA was based entirely upon the findings of CIGNA's own doctors, developed throughout the course of its investigation into Dr. Barnes' claim. In fact, according to CIGNA's internal claim file, the **only** documentation that Mr. Engel was instructed to consider was the Physical Abilities Assessment form produced by Dr. Pickett during his IME of Dr. Barnes. (See Internal Claim File "Referral Resource," page 31, annexed hereto as Exhibit "L.") Dr. Pickett's **opinion** is apparently the only "evidence" that was considered in the course of the TSA, despite the obvious bias demonstrated by Dr. Pickett, and the erroneous nature of his own examination and report, therefore rendering the results of the TSA tainted and unreliable, as well.

In considering Dr. Barnes' "work history," Mr. Engel did not consider Dr. Barnes' attempted vocational rehabilitation in 1999, nor did he consider the fact that Dr. Barnes was unsuccessful in her previous attempts to return to work. Certainly, the obstacles she faced in her workplace, including her inability to sustain a full work day due to her fatigue, her difficulty in processing

Lorraine Adell Harris
February 9, 2007
Page 47

thoughts due to her medications and fatigue, and her increased pain with work activities would have been pertinent information that should have been evaluated along with the information provided to Mr. Engel by CIGNA.

In fact, the "transferrable skills" identified by Mr. Engel were not even accurate, given her condition, as her ability to apply knowledge, logic, and scientific methods, directing others, interpreting and reporting scientific data, and making judgmental and verifiable data, are all not skills that Dr. Barnes can adequately perform, given her significant restrictions and limitations. Not only does Dr. Barnes not have the physical capacity to even sustain a full work day in which she could reasonably apply these skills, but the powerful narcotic medications, and various other prescription medications she takes at the direction of her doctors, renders her unable to perform these largely mental tasks. As Dr. Barnes must take these medications on a regular basis, she certainly cannot be expected to be responsible for others, as in a teaching position; apply knowledge and logic, where her ability to think clearly and logically and make judgmental and verifiable decisions is impaired by her medications, depression and fatigue; and her ability to interpret and report technical and scientific data is significantly impaired, as this closely mirrors her duties in her previous occupation, from which CIGNA found her disabled. Indeed, as sitting at a desk for long hours, working on reports of a scientific and technical nature, led her to such a physically crippled state, CIGNA can hardly find Dr. Barnes to be capable of performing such work, after all that she has been through.

Furthermore, the specific positions Mr. Engel identified as positions that Dr. Barnes would be capable of performing are inappropriate, considering her transferrable skills, work history, and physical and cognitive restrictions and limitations. CIGNA's identification of positions including "research associate" in a museum or art gallery, and "claim examiner" in business services, is inappropriate in that these positions would be quite similar to her previous position, as they would involve long hours of sitting at a desk, performing research or examining issues and recording/reporting data. The history of her disability demonstrates her inability to perform these duties on a regular basis.

CIGNA also identified "examiner" in government services as a position Dr. Barnes would be capable of performing; this, too, is incorrect, and overly vague, as CIGNA fails to elaborate as

# FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 48

to what types of duties this occupation would actually involve on a regular basis. Regardless, as a sedentary position, it would likely require long periods of sitting, as well as standing and/or walking, and would involve a degree of mental acuity that is beyond that of Dr. Barnes' capability for the aforementioned reasons.

CIGNA also claimed that Dr. Barnes could perform the duties of a hazardous waste management specialist; beyond the obvious issue that Dr. Barnes has no formal training or expertise in hazardous waste management, which would hardly qualify her as a "specialist," this position is, again, quite similar to her previous position as a research scientist, one that was beyond her physical and mental ability, and given her inexperience in the specialty of waste management, even more demanding on her, physically and mentally, than before.

Finally, CIGNA found that Dr. Barnes would be capable of working as a writer of technical publications, and as an instructor at a correspondence school. The identification of these positions is most troubling; first of all, working as a writer of technical publications would involve long hours of writing reports, which led to the onset of her disabling condition, and her continuing to work in that capacity caused her condition to worsen a great deal. Therefore, it is not only irresponsible but extremely unethical for CIGNA to even suggest that Dr. Barnes return to such a position, where her medical record clearly demonstrates that such activity caused exacerbation of her already-painful condition, to the point where she is completely disabled.

CIGNA claimed that Dr. Barnes can work as an instructor in a correspondence school; yet it failed to articulate in what way Dr. Barnes would be qualified, or capable, of working in this capacity. CIGNA failed to identify in what manner Dr. Barnes would work as an instructor; certainly, she would not be qualified to teach english, a foreign language, history, or essentially any subject matter outside of certain aspects of science. CIGNA, however, did not specify in which way Dr. Barnes would be working, and this nondescript, unclear assignment does not constitute a reliable position in Dr. Barnes' labor market. It is quite possible that the position CIGNA identified is for one in a field in which Dr. Barnes has no expertise, and likely no knowledge that would render her a qualified candidate for such a position. CIGNA cannot simply state that Dr. Barnes can work as an instructor, where she has no teaching experience, and not even identify in what manner she would

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 49

be teaching. This position is not consistent with her work history, skills, education or restrictions and limitations.

Mr. Engel also failed to identify if any of these positions would allow for alternative switching positions between sitting and standing, whenever needed; he did not indicate whether or not any of these positions would allow for constant change of position while seated, if the ability to lie down for breaks would be possible, and if these positions would involve bending, squatting, reaching, kneeling, or climbing. Mr. Engel merely selected a number of positions in a given region, without any regard to the strict accommodations that would be placed upon Dr. Barnes in any occupation, regardless of the physician (Dr. Barnes' own doctors, or those who participated in her evaluation as arranged and paid for by CIGNA) whose opinion you choose to adopt.

In addition, the positions that CIGNA listed were all located in San Francisco. Dr. Barnes lives in Concord, California, which is 31.26 miles from San Francisco, or 39 minutes, **at a minimum**[5], of driving each way (or more, depending on how far into the city of San Francisco these positions were located, and depending on the traffic patterns at the time of travel - rush hour, etc.). Given that Dr. Barnes is incapable of driving for more than a very short period of time around town, and only when absolutely necessary (for doctor appointments, etc.), it can hardly be argued that Dr. Barnes should drive for one hour and 18 minutes at a minimum each day, when her doctor has found that she **should not drive at all unless absolutely necessary** for a doctor appointment or quick errand. Certainly, the medications Dr. Barnes must take on a daily basis make driving for any period of time quite hazardous to her safety.

[In the past, Dr. Barnes implemented telecommuting while attempting to continue working; this was supported by her doctor, William Ross, M.D., who wrote a letter to CIGNA regarding the issue of her commute to work, and its exacerbating effect on her back pain. Dr. Ross indicated that Dr. Barnes' commute to work at that time, 28 miles in length and which frequently lasted over an hour each way because of rush hour traffic, aggravated her pain and reduced her overall productivity

---

[5]     The actual time it would take for Dr. Barnes to drive to work would be much longer, as rush-hour in her region can extend her commute considerably.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 50

for the remainder of the day. Dr. Ross explained that Dr. Barnes' improvement had been slow and that it was easily set back by such activities as driving. Dr. Ross' proposal for a modified work schedule, including 50% of the work being performed by telecommuting, was accepted and Dr. Barnes implemented this accommodation for a period of time before her condition became too debilitating and she was unable to continue working at all. See Letter from Dr. Ross, dated December 21, 1995, annexed hereto as Exhibit "M." (A subsequent letter from Dr. Ross - also attached- requested increasing the duration of telecommuting, so that Dr. Barnes would only have to commute to work one day per week, as the commute was continuing to aggravate Dr. Barnes' condition.) This letter is significant, as at the time it was written, Dr. Barnes' commute involved a shorter commute than the one expected of Dr. Barnes' by CIGNA, given the location of the positions identified by the TSA, yet the concerns regarding Dr. Barnes' ability to drive, and handle such a strenuous commute, were not considered.]

It is obvious that Mr. Engel's Transferrable Skills Analysis did not provide an accurate account of Dr. Barnes' employability in the area in which she lives. CIGNA failed to adequately identify Dr. Barnes' actual restrictions and limitations, by its continued refusal to credit the opinions of her treating physicians, in favor of a biased medical examiner who only met Dr. Barnes once, and has failed to appreciate the serious nature of Dr. Barnes' condition. Dr. Barnes has expressed an interest in returning to work in some way, but unfortunately she is unable to work in any capacity. Mr. Engel's report is improper, is inconsistent with Dr. Barnes' medical history (which is the likely result of his limited access to Dr. Barnes' medical recordss) and fails to correctly identify any positions in her region for which she is capable of performing the material duties of on a regular basis. As such, CIGNA has, again, failed to provide any rational or factual basis for finding Dr. Barnes capable of performing at a sedentary work level. CIGNA's reliance upon the TSA, and the erroneous reports upon which it was based, demonstrates its failure to provide Dr. Barnes with a full, fair and neutral review of her claim, which led to its improper, incorrect determination regarding her claim.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 51

## 4.    CIGNA Utilized a Selective Review of Dr. Barnes' Medical Records

In its purported review of Dr. Barnes' claim, CIGNA failed to properly evaluate the extent of her disability as it failed to properly evaluate the medical support for her claim, opting instead to review only small portions of Dr. Barnes' claim file while ignoring a wealth of material which supported her inability to work.

In particular, CIGNA accorded highly disproportionate weight to the opinions of the findings of the evaluations it arranged, with a doctor who only met Dr. Barnes once, while essentially ignoring the opinions of Dr. Barnes' treating physicians, who have a long history of treatment with her and have witnessed firsthand the deterioration of her health. Dr. Joel, in particular, provided a wealth of compelling medical documentation of her disabling condition, and her other doctors also provided numerous additional medical records, including doctors' notes, surgical procedure records, and objective diagnostic test results that serve to support her disability claim.

However, CIGNA chose to rely exclusively upon the flawed results of a medical examination performed by Dr. Pickett, despite the fact that Dr. Pickett committed a great number of procedural irregularities during the examination, failed to properly consider Dr. Barnes' medical history, failed to review Dr. Barnes' complete medical record, failed to consider the effects of Dr. Barnes' medications (especially the immediate effect of the pain medication she had just taken on the results of her physical examination) and allowed his bias, as a paid employee of CIGNA, to influence his determination regarding her ability to work as a result of her disability.

Similarly, despite acknowledging a wealth of supportive medical documentation, CIGNA relied upon the erroneous report of Dr. Waltrip, who never met or examined Dr. Barnes, but largely mirrored the findings of Dr. Pickett, to whom he deferred his opinion regarding Dr. Barnes' disability. By the very fact alone that he deferred his opinion to Dr. Pickett, Dr. Waltrip's opinion should be excluded completely from consideration by CIGNA in forming its claim determination, given that it is not a separate, independent opinion, but rather a carbon copy of the findings of Dr. Pickett. It should therefore **not** be utilized in the course of Dr. Barnes' claim.

Even more alarming, CIGNA completely ignored the opinion of two of its own in-house reviewers, Dr. Thomas Franz and Judy Porreca, R.N., in forming its determination. Despite the fact

Lorraine Adell Harris
February 9, 2007
Page 52

that these reviews took place in 2001, other, less compelling records from that same year (more significantly, the FCE) which could be perceived as damaging to Dr. Barnes' claim, **WERE** considered. It would appear as though CIGNA, by ignoring the opinions of some of its in-house reviewers, and completely adopting the positions of others, was searching for an excuse to terminate Dr. Barnes' claim, by accepting only those opinions which would serve to do so. Such conduct smacks of self-interest, is arbitrary and capricious in nature and demonstrates CIGNA's refusal to provide Dr. Barnes with a full, fair and neutral review of her claim.

CIGNA's determination is curious, when considering that its own claim personnel, in 2002, found Dr. Barnes' condition to satisfy the definition of disability, and somehow, four and a half years later, while her condition has only deteriorated since then, CIGNA finds her capable of working. By inter-office memo on July 12, 2002, Teresa Haberstock, a CIGNA employee involved with Dr. Barnes' claim, sent a memo to Theresa Sable (another CIGNA employee) regarding the status of Dr. Barnes' claim. See Memo, annexed hereto as Exhibit "N." The memo noted that "we have extensive records from Dr. Joel's office from 4-5-01 to 3-4-02. We also have the detailed report from Dr. Van de Bittner dated 2-22-02. This documentation fully supports the claimant's inability to perform any occupation at this time." However, since the date of that memo, Dr. Barnes has demonstrated NO improvement whatsoever in her condition, nor in her functional ability, that would lead CIGNA or any reasonable individual to believe that she is now capable of working in any occupation. Therefore, CIGNA's termination of Dr. Barnes' claim is preposterous.

CIGNA's conclusions are highly suspect, as they fail to consider a wealth of supporting information and documentation, choosing instead to "cherry pick" information in support of an adverse benefit determination. CIGNA selectively reviewed materials that were favorable to CIGNA's denial, to the exclusion of strong evidence from Dr. Barnes' physicians in support of her claim. Such conduct has been repeatedly held to constitute arbitrary and capricious conduct by an insurer in the ERISA LTD landscape. See Govindarajan v. FMC Corp., 932 F.2d 634 (7th Cir. 1991), which held that the selective review of medical evidence to justify denial of benefits is arbitrary and capricious. Here, it is readily apparent that the reviews performed by CIGNA was at best selective. See Carugati, 2002 U.S. Dist. LEXIS 4774, at * 18-19. A neutral fiduciary would not have acted in

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 53

this manner; rather, a neutral evaluator of the medical records would have appreciated the significance of the clinical findings by Dr. Barnes' treating physicians, instead of focusing on minute, distorted findings and the flawed reviews of Dr. Barnes' medical records performed by two doctors employed by CIGNA, one of which never met Dr. Barnes and simply adopted the erroneous opinion of the other, with questionable validity.

Courts have time and again taken insurers to task for their selective use of records to support a denial of a claim. See DiPietro v. Prudential Ins. Co. of America, 2004 U.S. Dist. LEXIS 5004 (N.D. Ill. 2004)(where the court held that selective review of the evidence was arbitrary and capricious, the proper remedy was an award of benefits rather than a remand to the insurer for further claim handling); Pelchat v. UNUM Life Ins. Co. of Amer., 2003 U.S. Dist. LEXIS 8095 (N.D. Ohio 2003)(collecting cases for this proposition and determining that where insurers' reliance on earlier portions of a physician report while ignoring later prognosis of same doctor, conduct was arbitrary and capricious). The court in Pelchat therefore granted judgment to the claimant and did not remand the claim back to the administrator for further claim handling. See Ebert v. Reliance Standard Life Ins. Co., 171 F.Supp.2d 726 (S.D. Ohio 2001)(finding that insurer failed to act as a neutral evaluator of the claim, where it selectively used bits and pieces of records to support a denial of a claim). Here, it is apparent that CIGNA's conduct is arbitrary and capricious where it only acknowledged a small portion of Dr. Barnes' medical records, while essentially ignoring the opinion of her treating physician, Dr. Joel, and various others who were substantially involved in her medical care.

## III.    CIGNA'S DECISION TO TERMINATE BENEFITS WAS ERRONEOUS AND MUST BE REVERSED

### A.    Dr. Barnes is Entitled to Disability Benefits on the Basis that She is Unable to Perform All the Essential Duties of Any Occupation

Dr. Barnes remains disabled due to her severe and debilitating medical conditions, including but not limited to failed diskectomy/failed back syndrome, L5-S1 fusion, multilevel lumbar disc disease, posterior compartment syndrome (i.e. SI and facet joints), neuropathic pain, myofascial syndrome, resulting in myofascial cervicogenic headaches, cervical disease, displaced knee cap,

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 54

damaged cartilage of the knee, sciatica in both legs, reactive sleep disturbance, endometriosis, depression, and intermittent cognitive impairment secondary to her intractable pain and medications, Dr. Barnes is unable to engage in her regular occupation or any other occupation for which she is reasonably suited based upon her age, training, education and experience.

Dr. Barnes describes the difficulties she has encountered in trying to manage the painful symptoms of her conditions, both in the workplace and in her personal life, in her personal statement, wherein she states:

> I used to be able to agree to do something and then follow through with my agreement. These days, I have great difficulty with doing anything that causes me pain. My body can not be willed to do painful tasks any more. I can not push through the pain any more. I was in so much pain that it felt like I had been waging war. I do not know how I ever did all those reports in a row without a break. Something has changed in me because I could no longer ever sit with so much pain.   I would have great difficulty going to work. I have such a difficult time in the morning that showing up on time or at the same time every day would be impossible. I wake up and take my meds before I actually get out of bed.  Sometimes, my meds put back into a deep sleep that then goes on into the morning. I often wake and still feel very sleepy, as if my nighttime meds were still acting.  There are many mornings that I wake with a headache in addition to other body aches. I usually get out of bed because my legs are radiating pain down the sides. So I wake to pain, stiffness, headache and fatigue.
>
> When I need to concentrate on matters that demand my attention, I try to do it in the morning after my pain meds and while I drink my coffee. I have a couple of hours that I can pay attention, at best. Some days two hours is much longer than I can focus. My brain is too scattered later in the day to focus and pay attention to important decisions. It takes me forever to complete simple written tasks because of limited attention due to a combination of factors including meds, pain, fatigue related to pain.
>
> I am not comfortable enough to focus while in many situations. If I have to sit in a crummy hard chair, I start to lose control in a very short period of time. My tail bone gets so sensitive and painful while my upper back spasms painfully. I can no longer sit through an hour-long presentation because my pain takes over. I have one chair in my home that is ok for me but I always have the chair reclined to take the most of the weight off my spine. The chair also gives me upper back and neck support. I sit in the chair with my legs crossed which takes some of the pressure off of my thighs.
>
> Interacting with people is stressful, more so than when I used to work.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 55

My nervous system is hypersensitive due to my constant pain. It takes very little worry for me to break out in severe sweats. Interacting with people usually requires concentration and I lose that quickly.

Sitting is one of the most difficult activities for me. Sitting at a desk is even worse pain for my back. My tailbone starts to feel a burning pain that gets worse and worse with each minute of sitting. Bending my neck to look down at the desk causes me severe upper back spasms. Continued desk work has a cumulative negative effect on my pain and ability to concentrate. Daily desk work causes my pain to go off the chart. My pain medicine is not enough to manage my back pain when I sit at a desk.

Over the course of the day I have several attacks of GI pain that put me down for a half hour at a time. I wake to fog and confusion with back pain in the morning. After waking up I feel ok to check my email on my laptop or read the paper for a short time, and then my brain needs a rest. I take my meds four to five times over the day...

\*      \*      \*

Sometimes my pain medicine makes me sleepy. Other times it actually wakes me up because of the pain relief. I need to take the laxative and stool softener twice a day to keep my bowels moving because the OxyContin slows everything down. I take Nexium and Zelnorm to reduce my other GI issues related to OxyContin. It is a balancing act throughout the day...

Everyday, I need to lay down to help with my back pain and the fatigue associated with constant pain. Despite my meds, my pain comes through most of the day. I work to tolerate the pain, take a break-though med, or manage my activities so that I do not overdo. Laying down takes a load of pain off my spine and allows me to clear the pain from my brain. While lying down I may watch some TV but much of the time I just need peace and quiet. I rest in the mid-day. The amount of time varies depending on how I feel on a particular day. I am lost without my rest so I make sure to get at least fifteen minutes on those really busy days. Most days I take my afternoon pain meds and then rest/wait for them to take effect. Without my rest, I would strain through the simple activities that now make up my day.

See Personal Statement of Jane Barnes, annexed hereto as Exhibit "A."

As demonstrated by the medical records of Dr. Joel and her various other treating physicians, and by her own personal statement, Dr. Barnes is physically and mentally limited in her activities. These restrictions include both work and leisure activities, as well as activities of daily living. It is apparent that based upon Dr. Barnes' treating doctor, employment with any reasonably continuity

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 56

is not a suitable option for Dr. Barnes at this time. This is due to a combination of the severe and chronic disabling pain that Dr. Barnes suffers from and the impact of the medications that Dr. Barnes is compelled to take to address her chronic pain. Thus, there has been an obvious negative effect on her functional abilities and her energy level.

These various conditions have complicated Dr. Barnes' life and have made many of her previous day-to-day activities difficult and even impossible at times. Dr. Barnes is on a multitude of medications in an attempt to manage her symptoms. Dr. Barnes takes the following medications on a regular basis: Oxycontin[6], Norco[7], Buspar[8], Ambien CR[9], Sonata[10], Hytrin[11], Effexor XR[12],

---

[6]     The adverse effects of this medication include nausea, vomiting, constipation, mild itching, drowsiness, dry mouth, lightheadedness, loss of appetite, and weakness.

[7]     The adverse effects of this medication include nausea, vomiting, constipation, lightheadedness, dizziness, drowsiness, flushing, vision changes, and mental/mood changes.

[8]     The adverse effects of this medication include dizziness, drowsiness, headache, nausea, nervousness, lightheadedness, restlessness, blurred vision, tiredness, and trouble sleeping.

[9]     The adverse effects of this medication include dizziness, daytime sleepiness, lightheadedness, headache, upset stomach, diarrhea, and dry mouth. To minimize the risk of falls, one must remember to get up slowly when rising from a seated or lying position.

[10]     The adverse effects of this medication include dizziness, drowsiness, short-term memory loss, and lack of coordination.

[11]     The adverse effects of this medication include fatigue, nausea, drowsiness, lightheadedness, dizziness, blurred vision, headache, and stuffy nose. To minimize dizziness and the risk of fainting, one must get up slowly when rising from a seated or lying position.

[12]     The adverse effects of this medication include headache, drowsiness, dizziness, nervousness, trouble sleeping, dry mouth, nausea, vomiting, blurred vision, altered taste, sweating, mood/mental changes, stomach upset, tremor, constipation, loss of appetite, weight loss, anxiety, and yawning.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 57

Skelaxin[13], Senocot[14], Lidocaine Nasal Spray[15], Celebrex[16], Inderal[17], Zyrtec[18], Fentora[19], Toprol XL[20], Nexium[21], Zelnorm[22], Prochlorperazine[23], Provigil[24], Stool softener[25], Synthroid

---

[13]    The adverse effects of this medication include stomach upset, nausea, constipation, dry mouth, headache, blurred vision, lightheadedness, dizziness and drowsiness.

[14]    The adverse effects of this medication include diarrhea, nausea, vomiting, rectal irritation, stomach cramps and bloating.

[15]    The adverse effects of this medication include dizziness, drowsiness, nausea, stinging, swelling, and burning.

[16]    The adverse effects of this medication include stomach upset and gas.

[17]    The adverse effects of this medication include dizziness, lightheadedness, drowsiness, tiredness, diarrhea, unusual dreams, trouble sleeping, and vision problems.

[18]    The adverse effects of this medication include drowsiness, fatigue and dry mouth.

[19]    The adverse side effects of this medication include nausea, vomiting, dizziness, sleepiness, headache, constipation, pain or sores on the gum or inside the cheek, decreased blood pressure, and physical dependence on the drug.

[20]    The adverse side effects of this medication include dizziness, lightheadedness, drowsiness, tiredness, diarrhea, unusual dreams, trouble sleeping, and vision problems. This drug may reduce blood flow to your hands and feet, causing them to feel cold.

[21]    The adverse side effects of this medication include headache, diarrhea, nausea, gas, stomach pain, constipation and dry mouth.

[22]    The adverse side effects of this medication include headache and joint pain.

[23]    The adverse side effects of this medication include constipation, drowsiness, dizziness, blurred vision and dry mouth.

[24]    The adverse side effects of this medication include headache, nausea, nervousness, anxiety, dizziness, and difficulty sleeping.

[25]    The adverse side effects of this medication include diarrhea, nausea, vomiting, rectal irritation, stomach cramps and bloating.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 58

(levothyroxine)[26], and Biotene products (oral balance gel, toothpaste, mouthwash and gum care to help alleviate her severe dry mouth related to her medications).

Courts have repeatedly chastised insurers for their failure to consider the impact of medications on a claim beneficiary's inability to work. Conrad v. Reliance Std. Life Ins. Co., 292 F.Supp.2d 233 (D. Mass. 2003); Adams v. Prudential Ins. Co. of Amer., 280 F.Supp.2d 731 (N.D. Ohio 2003); Godfrey v. BellSouth Telecoms, 89 F.3d 755 (11th Cir. 1996); Dirnberger v. UNUM Life Ins. Co. of Amer., 246 F.Supp.2d 927 (W.D. Tenn. 2002). These cases highlight the obligations that CIGNA is compelled to uphold in performing a full and fair review of Dr. Barnes' claim.

### B.    CIGNA Must Consider Dr. Barnes' Co-Morbid Conditions

Dr. Barnes suffers from a number of co-morbid conditions, including failed discectomy/failed back syndrome, L5-S1 fusion, multilevel lumbar degenerative disc disease, posterior compartment syndrome (i.e. SI and facet joints), neuropathic pain, myofascial syndrome, resulting in myofascial cervicogenic headaches, cervical disease, arachnoiditis, endometriosis, sciatica in both legs, displaced right knee cap, right knee cartilage damage, chronic pain syndrome, reactive sleep disturbance, depression, and intermittent cognitive impairment secondary to her intractable pain and medications.

It is incumbent upon CIGNA to view Dr. Barnes' disability as a combination of all of her disabling conditions, rather than evaluating each condition separately. The combination of Dr. Barnes' co-morbid conditions each exacerbate one another and further complicate her overall health. In effect, her various co-morbid conditions aggravate one another and her symptoms are exacerbated by, not only the conditions themselves, but the medications often necessary to control each. The side effects associated with many of Dr. Barnes' medications often have a negative impact on the various other conditions Dr. Barnes suffers from.

---

[26]    The adverse side effects of this medication include headache, nervousness, trembling, sweating, increased appetite, diarrhea, weight loss and insomnia.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 59

As a result of Dr. Barnes' back pain, which causes her to favor one leg over the other at times, Dr. Barnes has developed substantial knee problems, including displacement of her right knee cap and damage to the cartilage of her right knee. This can be extremely painful, and is further complicated by the effects of her back condition, including sciatica, which causes radiating pain from her back through to both legs. Sciatic pain (and sometimes weakness, tingling or numbness of the legs) is worsened by such activities as sitting, standing for an extended period of time, and movements that cause the spine to flex. Sciatic pain can be quite debilitating, especially in combination with other back conditions (as here).

Dr. Barnes also suffers from arachnoiditis, which was likely caused by a complication during one of her spinal surgeries. Arachnoiditis is a pain disorder caused by the inflammation of the arachnoid (one of the membranes that surround and protect the nerves of the spinal cord. Symptoms of this disorder include numbness, tingling, stinging and burning pain in the lower back or legs; as well as debilitating muscle cramps, twitches, and/or spasms. It may also affect bladder, bowel and sexual function. It remains a disorder that is difficult to treat with a poor prognosis for improvement, with treatment focusing on pain relief and improvement of functions that impair daily function[27].

As mentioned earlier, Dr. Barnes has struggled with endometriosis for quite some time, and has had several surgical procedures in an effort to treat this condition. Endometriosis, which is characterized by the grown of endometrium tissue outside of the uterus, can cause a number of symptoms, including pain in the pelvic region, severe menstrual cramps, low back ache 1-2 days before menstruation, rectal pain, pain during bowel movements, abnormal bleeding (bleeding in the urine or stool, abnormal vaginal bleeding), and infertility.

Complicating her health further, Dr. Barnes suffers from reactive sleep disturbance, which prevents Dr. Barnes from getting a full night's rest, and therefore not allowing Dr. Barnes' body to recover from the stress of her day. Dr. Barnes' body is therefore constantly in a state of stress, which has a substantial impact on her pain, especially in such a sensitive and central location as her spine.

---

[27]    From: National Institute of Neurological Disorders and Stroke - NINDS Arachnoiditis Information Page

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 60

Dr. Barnes takes a number of medications throughout her day, some of which make her drowsy and others which keep her awake, or which produce adverse side effects including difficulty sleeping. This also causes cognitive deficiencies associated with sleep disturbance, which aggravate those cognitive impairments Dr. Barnes already suffers as a result of her conditions and as a result of the medications she takes on a regular basis.

It is imperative that CIGNA consider ALL of Dr. Barnes' conditions; not only each one individually, and the combination of these complaints as a whole, but the various ways in which each condition is worsened by all of the other respective illnesses. Dr. Barnes' overall health is the concern; in evaluating her disability, all conditions, and their relationship to one another, must be considered.

For example, in Abram v. Cargill, 395 F.3d 882 (8th Cir. 2005), the court found that an ERISA plan administrator could not ignore the insured's co-morbid condition in evaluating his claim for disability benefits. In Abram, the court found that the plan should have considered Abram's co-morbid condition in deciding whether she was disabled and remanded the case. The court stated that, "where a condition is specifically identified by the medical examiner on whom the plan relies, it must be addressed in the plan's decision. The Plan is not free to ignore evidence of this second, potentially disabling condition." Id. at 887.

The holding in Abram is consistent with earlier district court cases which encouraged plan administrators to look at the entire combination of impairments from which a claimant suffers. Thus, analysis of the co-morbidity of a claim is mandated.

In another case, Willis v. Baxter International, Inc., 175 F.Supp. 2d 819 (W.D.N.C. 2001), the court found that the defendants should not have evaluated plaintiff's individual impairments in isolation, but that the combination of her impairments should have been considered.

Willis, an assembly line packing inspector, suffered from a number of impairments, all of which appeared to stem from her morbid obesity. Her documented medical conditions included fibromyalgia, arthritis, degenerative disc disease, sleep apnea, diabetes, superficial phlebitis, morbid obesity, bowel and bladder incontinence, chronic pain syndrome, a history of knee and back surgery

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 61

and a history of cancer. Defendant's denied her claim for disability benefits, based on the conclusion that Willis lacked objective medical evidence to document her claim. Id.

The administrative record showed an extensive medical history of impairments, all connected to plaintiff's medically documented underlying condition. Id. "In making [its] finding, the decision, the decision maker rejected a substantial amount of plaintiff's medical evidence; considered each impairment (and the supporting medical evidence) in isolation; discredited plaintiff in her personal accounts of the disabling effects of her impairments, both directly and indirectly; and required objective medical proof of subjective impairments, such as pain, without considering the impact of such pain on plaintiff's daily activities," the court said. Id. at 830.

The court cautioned that "each illness standing alone, measured in the abstract, may not be disabling. But disability claimants are not to be evaluated as having several hypothetical and isolated illnesses." Id. at 831. Accordingly, the court found that the plaintiff was suffering from a combination of severe impairments that, when considered together, would prevent her from doing even sedentary work. Here, CIGNA must consider Dr. Barnes' co-morbid conditions together.

By failing to consider the ways in which each of these conditions can work to exacerbate symptoms of other co-morbid conditions, CIGNA did not fully grasp the severity of Dr. Barnes' disability and, in effect, reached an improper decision on her claim for benefits.

C.    CIGNA's Determination Continues a Pattern of Arbitrary and Capricious Conduct by the Company Which Has Been Recognized by Many Courts in Several Jurisdictions

Courts throughout the country have determined that the conduct at issue here was arbitrary and capricious in CIGNA's handling of long term disability claims.

Unfortunately, it appears that CIGNA has failed to provide Dr. Barnes with a "full and fair" review of her claim, which it is required to do under ERISA, the regulations governing ERISA LTD claims and the body of case law interpreting these laws and regulations. The treatment of Dr. Barnes' claim is consistent with a pattern by CIGNA in many other Long Term Disability cases, where courts have deemed its conduct to be arbitrary and capricious and have reversed denied or

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 62

terminated claims. Many of the claim handling issues seen in Dr. Barnes' claim have been found to form the basis of arbitrary and capricious conduct by Federal Judges throughout the country. See Karanda v. Connecticut General Life Insurance Co., 158 F. Supp. 2d 192 (D. Ct. 2000), discussed below; Adams v. CIGNA Group Insurance Life Accident Disability Co., 2004 U.S. Dist. LEXIS 4983 (N.D. Ill. 2004).

In Fordyce v. Life Ins. Co. of North Am. (CIGNA), 340 F.Supp.2d 994 (D. Minn. 2004), the court held that CIGNA did not conduct a full and fair review of the claim, and thus abused its discretion. The court was particularly concerned about CIGNA's focus upon equivocal physician statements and the failure to address extensive medical support for the claim. Id. at 1006. The court was also troubled by CIGNA's dismissal of the claimant's subjective complaints of pain, the refusal to credit the treating physician in favor of a paper reviewing physician, and the lack of a vocational assessment. See also Caldwell v. Life Ins. Co. of North Am. (CIGNA), 287 F.3d 1276 (10th Cir. 2002)(where court affirmed decision in favor of claimant and against CIGNA where claim handling skewed review of medical records and decision was deemed arbitrary and capricious); see also Di Giovanni v. Chevron Corp. Long Term Disability Plan, 2003 U.S Dist. LEXIS 18805 (N.D. Cal. 2003)(where court determined that decision to terminate benefits to claimant was not supported by evidence and was thus arbitrary and capricious). There, the claims handling unit failed to follow its own guidelines in conducting a proper review of the claim and thus abused its discretion. The court noted a myriad of procedural irregularities in the claim handling, requiring reversal of the claim determination.

These cases reveal a disturbing pattern demonstrating that CIGNA breaches its fiduciary obligations to beneficiaries under ERISA in failing to provide claimants, like Dr. Barnes, with a "full and fair" review of their claims, and regularly fails to act as a neutral arbiter of claims, rather than as a financially interested party to the claim.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 63

### D.    CIGNA's Conflict of Interest Served to Guide Its Improper Claim Determination

CIGNA, as the entity required to make payments under the policy of insurance in which Dr. Barnes was a beneficiary, and as the entity delegated with the responsibility for deciding the claim, operates with a conflict of interest that served to guide its improper claim determination.

This conflict is heightened by CIGNA's potential liability and the fact that its exposure to Dr. Barnes was significant. Dr. Barnes' benefits were contractually payable for several more years, and constituted significant financial exposure to CIGNA, due to the lengthy period of liability Dr. Barnes' claim represented.

Courts have repeatedly held that where an insurer operates as the claim administrator and claim payor, such a conflict must be considered in determining whether the claim determination was proper. Thus, even if CIGNA was afforded discretion under the policy, its conduct will be viewed by a court de novo, or at a minimum, in a manner appropriate to account for the level of conflict which pervades Dr. Barnes' claim.

California long term disability claims are to be reviewed by the Federal Courts *de novo*, as the result of the invalidity of discretionary clauses in these insurance policies. Per the decision in Fenberg v. Cowden Automotive Long Term Disability Plan, 2004 U.S. Dist. LEXIS 22927 (N.D. Cal. 2004), where Judge Illston ruled that discretionary clauses in these policies are invalid as per the California Insurance Department's February 26, 2004 ruling. Thus, the decision to terminate Dr. Barnes' claim will not be afforded any judicial deference.

Case law has suggested a number of factors that may constitute "material, probative evidence" of a serious conflict of interest, including:

a)    where the administrator provides inconsistent reasons for its claim denial;
b)    where the administrator relies upon an improper disability definition in denying the claim for benefits;
c)    where the administrator determines a material fact for which there is no supporting evidence;
d)    where the administrator fails to follow plan procedures;
e)    where the administrator fails to provide requested information;
f)    where the administrator fails to provide a full and fair review of the claim and its denial;

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 64

g)  where, taken as a whole, the record suggests that the administrator acted as an adversary determined to deny the claim.

See Raithus v. UNUM Life Ins. Co. of Amer., 335 F.Supp.2d 1098 (D. Haw. 2004).

Here, where CIGNA's claim determination is predicated upon a flawed, biased medical review performed by a doctor paid by CIGNA, discussed infra, the conflict which CIGNA has in its dual role is ever more pronounced and reveals that its claim decision was strongly influenced by its conflict. These reports have little credibility and CIGNA's reliance upon such material, to the exclusion of supportive materials for Dr. Barnes, demonstrate that her claim was not afforded a full and fair review as the result of CIGNA's conflict of interest as claims payor and claim administrator.

E.  **The Intensity of CIGNA's Conflict Dictates that No Deference Should be Afforded to its Claim Determinations**

As discussed above, a sliding scale approach will apply to the deference that is afforded to a claim determination made by a conflicted decision maker. Here, where CIGNA was called upon to decide a claim with a significant monthly entitlement to benefits, and where the claimant is young and, therefore, the exposure to CIGNA is greater in years than in many cases, the amount of deference that will be afforded to its claim determination is minimal.

Here, like in Hagsberg v. Liberty Life Assurance Co. of Boston, 2004 U.S. Dist. LEXIS 11324 (N.D. Fla. 2004), it is readily apparent that CIGNA's conduct is tainted by self interest, and that, like in Hagsberg, CIGNA was eager to find a reason to deny Dr. Barnes' benefits without regard to her actual capacity to engage in full time employment. In Hagsberg, the court reinstated benefits to a claimant whose claim was denied. Id. at * 9. CIGNA's conduct is egregious; fails to afford Dr. Barnes an appropriate review of her claim, affording appropriate deference to the consistent opinions of her treating physicians, without demonstrating any basis for ignoring her treating physician's opinion; and simply demonstrates a conscious desire to remove an expensive liability from its balance sheet, to the detriment of a beneficiary under ERISA.

 FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 65

### F.    CIGNA Is Obligated by Law to Consider and Address the Personal Statement of Dr. Barnes and Her Family

CIGNA must consider the personal statement of Dr. Barnes and the statements provided by her family in rendering its decision upon review, because the medical records alone do not tell the full tale of Dr. Barnes' restrictions and limitations. See Personal Statements of Dr. Barnes' Family, annexed hereto as Exhibits "O-P."

Dr. Barnes discussed the ways in which her condition has affected her personal and family life, in her personal statement, wherein she states:

> I used to have a social life. Entertaining is too stressful for me. The pressure to get everything ready is difficult. It is embarrassing to have company when the house is so dirty. It gets easier to not invite folk over. My last party was over five years ago. My close friends know when I get tired and need them to leave. Pain really fatigues me. Sometimes I just go to my bedroom and lay down while company is still around. It is impossible for me to maintain the domestic responsibilities I once enjoyed – even with help, things get overwhelming.

> I am no longer very social. I have few social interactions in a year. I spend most of my time home where I can get comfortable when I need to. I can not sit through a movie in a theater because of my sitting pains and their distractions. I have not seen a movie at a theater since my first back surgery. It hurts too much to remain seated through an entire movie. My sitting tolerance is very low because it starts to make my upper back go into spasm. At the same time my tailbone starts to get real painful. If I watch TV laying down, I often fall asleep before a program ends. Once my body is still, it is difficult to not give in to sleep. I gave up on dinner parties because the preparation used up all my energy.

> My husband and I used to go out several times a week. Although cooking can be painful and difficult, going out to dinner is often even more difficult for me. The whole process of getting ready is difficult. It requires standing, moving around the house quickly, changing clothes, and other trivial tasks that all add up to pain for me.

> I have difficulty agreeing to social engagements in advance as I rarely know how I will be feeling on that day. Most of my friends and family know that I will show up if I can get up for it. They understand how some days are too painful to follow-through. If I rest before a social engagement and time my pain meds correctly, I will do better and enjoy myself for a limited time and generally leave early when my pain becomes too intense.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 66

<u>See</u> Personal Statement of Jane Barnes, annexed hereto as Exhibit "A."

Dr. Barnes went on to describe the difficulties she had in accepting her limited abilities in terms of her domestic responsibilities. Dr. Barnes can no longer perform the household chores, especially cleaning her home, doing laundry, washing the dishes, and yard work, which she was responsible for prior to her disability. Dr. Barnes now relies upon her family to perform these tasks. As a result of her inability to contribute to the cleanliness of her home, Dr. Barnes explained that her home is never "all clean" and that as a result, she cannot invite family and friends over, nor can she travel or participate in outside social engagements, which further contribute to her feelings of isolation. <u>See</u> Personal Statement, annexed hereto as Exhibit "A."

Dr. Barnes' husband, Vic Rodrigues, submitted a statement in support of his wife's disability, as well. In his statement, Mr. Rodrigues noted that when he first met his wife, she was very active in swimming, as well as an avid jogger and bike rider. He recalled bike riding as one of their frequent activities, as well as going out to dinner, going to the movies, visiting friends and traveling. Mr. Rodrigues discussed the onset of Dr. Barnes' condition, which began in 1991, when her workload caused her to experience a great deal of pain in her back. Mr. Rodrigues indicated that he was involved in taking her to all of her doctor appointments and seeing her through hospital stays, so he witnessed firsthand the suffering she went through. He explained that she can no longer jog, swim, socialize, or participate in any of the activities she once enjoyed. He also noted that they cannot go to the movies, take long drives, or go to restaurants that are far away, as they once did, because his wife cannot sit for any length of time because of her severe pain. Mr. Rodrigues explained that his wife's personality has changed drastically, as her sense of humor is all but gone and she spends most of her day bedridden. <u>See</u> Statement of Vic Rodrigues, annexed hereto as Exhibit "O."

Dr. Barnes' stepdaughter, Veronica Rodrigues, also submitted a statement on her stepmother's behalf. In her statement, Ms. Rodrigues described Dr. Barnes prior to her disability as energetic and active, often taking her stepdaughter on outings to the aquarium, the beach, the park, or out to eat at restaurants. Then, Ms. Rodrigues explained, Dr. Barnes' overall health and demeanor underwent a drastic change, where she is now disheartened, depressed and in constant pain. She

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 67

indicated that her mom cannot sit for a long period of time, and that she and her father have helped out with household responsibilities, since Dr. Barnes cannot do them anymore. She also recalled certain times when she witnessed her mom's limitations, including one time when she saw her trying to tie her shoe and she was unable to; she noted that there are certain things that make the pain "literally paralyzing" and that she has watched her mom stand there, without being able to move for a couple of minutes, crying because the pain hurts so badly. In addition, Ms. Rodrigues noted that Dr. Barnes takes a great deal of medication every day, which cause her to suffer side effects and alter her personality. She explained that her mom can become frustrated and her behavior can be alienating to others; she is easily irritated and, even though she apologizes after an outburst, it is obvious that her mom is in a great deal of pain, as well as depression stemming from her inability to do all the things she used to enjoy. Ms. Rodrigues indicated that her mom spends most of her day in bed, that she hardly even sees her anymore, and that if her family did not have to endure her mom's disability, they "would live in a happier home." See Statement of Veronica Rodrigues, annexed hereto as Exhibit "O."

    As has been held by many federal courts, an appeals committee cannot simply decline to consider and accord significant weight to a participant's complaints of pain in an ERISA LTD claim. See Connors v. Connecticut General Life Ins. Co. 272 F.3d 127 (2d Cir. 2001). Indeed, a claims administrator will have abused its discretion if it discredits a plan participant's complaints of pain, weakness or fatigue without substantial evidence that the participant is exaggerating. See Smith v. Continental Casualty Company, 276 F.Supp. 2d 447 (D. Md. 2003). Nonetheless, as evidenced by Dr. Barnes' extensive medical records, her physicians' clinical observations, her personal statement, and the supportive statements written on her behalf by Vic Rodrigues, her husband, and Veronica Rodrigues, her stepdaughter, Dr. Barnes has strong support for her continuing disability and from her inability to perform, with reasonable continuity, the material and substantial duties of any occupation for which she is reasonably suited.



FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 68

## IV.    THE SOCIAL SECURITY ADMINISTRATION AGREES THAT DR. BARNES IS TOTALLY DISABLED

As set forth above, in its correspondence dated June 6, 1999, the Office of Central Operations of the Social Security Administration determined that Dr. Barnes is disabled under its rules as of December 15, 1997. See Social Security Administration Determination, annexed hereto as Exhibit "P."

Significantly, to qualify for Social Security disability benefits, Dr. Barnes' disability must be of such a severity that she is unable to engage in any kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423. Thus, the Social Security Administration's definition of total disability is far more stringent than the definition of total disability contained in Dr. Barnes' plan.

Clearly, Dr. Barnes is incapable of performing any gainful occupation in the United States. Logically, CIGNA is estopped from arguing that Dr. Barnes is able to perform some type of occupation while being simultaneously enriched by a determination that she is incapable of performing any gainful occupation in the United States. See Darland v. Fortis Benefits Insurance Company, 317 F.3d 516, 529 (6th Cir. 2002); Ladd v. ITT Corp.; 148 F.3d 753, 755-56 (7th Cir. 1998)(holding that a plan administrator's decision denying disability benefits where the Social Security Administration determined applicant was totally disabled was arbitrary and capricious).

Interestingly, in an effort to treat ERISA LTD claimants fairly, the United States' largest group disability insurer, UNUMProvident has agreed to account for determinations of disability by the Social Security Disability Agency. It would seem that CIGNA would act in a similar fashion in its continued obligation to treat its claim beneficiaries fairly. For CIGNA to accept the findings of Social Security that Dr. Barnes is disabled, in as much as it has applied to offset provisions in the policy, but to ignore the findings that she is physically unable to work at any job in the national economy (the standard applied by Social Security), is tantamount to an admission by CIGNA that its conduct is biased.

Based upon Dr. Barnes' personal statement, medical history, the medical opinions of her treating physicians, determination of the Social Security Administration and prevailing case law,

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 69

CIGNA must conclude that she continues to be disabled within the definition set forth in her plan. CIGNA's continuing refusal to pay Dr. Barnes' claim supports the contention that CIGNA has failed to act as a neutral arbiter of her claim. CIGNA, therefore, must immediately begin to pay Dr. Barnes benefits.

FRANKEL & NEWFIELD, P.C.

Lorraine Adell Harris
February 9, 2007
Page 70

## CONCLUSION

Jane Barnes has provided CIGNA with compelling medical evidence and corroborative support demonstrating that she is totally disabled from performing all the material duties of any occupation for which she is reasonably fitted, due to her severe and debilitating conditions, including failed discectomy/failed back syndrome, L5-S1 fusion, multilevel lumbar degenerative disc disease, posterior compartment syndrome (i.e. SI and facet joints), neuropathic pain, myofascial syndrome, resulting in myofascial cervicogenic headaches, cervical disease, endometriosis, arachnoiditis, sciatica in both legs, displaced right knee cap, right knee cartilage damage, chronic pain syndrome, reactive sleep disturbance, depression, and intermittent cognitive impairment secondary to her intractable pain and medications. Thus, it is respectfully submitted that CIGNA must reverse its determination terminating disability benefits to Dr. Barnes and determine that entitlement to such benefits continue since the date prior to the August 17, 2006 adverse benefit determination.

We look forward to a timely and favorable review of Dr. Barnes' claim.

Respectfully submitted,

FRANKEL & NEWFIELD, P.C.

By: _____
        Justin C. Frankel

JCF:dlw
Enclosures